30 Cal.3d 125 (1981)
635 P.2d 446
177 Cal. Rptr. 852
In re DEBORAH C., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent,
v.
DEBORAH C., Defendant and Appellant.
Docket No. Crim. 21768.
Supreme Court of California.
November 5, 1981.
*129 COUNSEL
Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Janice L. Feinstein, Deputy State Public Defender, and William Wesley Patton for Defendant and Appellant.
Wilbur F. Littlefield, Public Defender (Los Angeles), Dennis A. Fischer and Norma Mitchell, Deputy Public Defenders, as Amici Curiae on behalf of Defendant and Appellant.
George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Anthony D. Blankley, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.
Paul Arthur Turner, Robert T. Harris, Joan S. Sheppard, Julia Bell, Jones, Hall, Arky & McKenney, John K. Van de Kamp, District Attorney (Los Angeles), Harry B. Sondheim and John W. Messer, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.
OPINION
NEWMAN, J.
Each of two wardship petitions charges 15-year-old Deborah with a count of petty theft. (Welf. & Inst. Code, § 602; Pen. Code, §§ 484, subd. (a), 488, 490.5, subd. (a).) In a consolidated proceeding the juvenile court sustained both petitions. Deborah appeals, asserting that physical evidence and confessions obtained by store security guards should have been suppressed.
One charge involves shoplifting at an Orbach's store on July 12, 1979. At the adjudication-and-suppression hearing Joseph McGinnis, plainclothes security agent, testified that several times he saw Deborah palm costume jewelry from a display counter and hide it in her pocket. He followed her when with a friend she left the store without paying. McGinnis and his partner stopped her, took her to the store's security office, and placed her under citizen's arrest. Without giving a Miranda warning he asked her why she did it. She replied that her friend had told her it was easy to steal, so she thought she would. Over counsel's objection the jewelry and confession were admitted.
*130 A second charge alleged that on or about October 22, 1979, she stole clothing from a Broadway store. Bernadette Laskowski, plainclothes security agent, testified that Deborah aroused suspicion because she was carrying a "large old plastic bag" and "walking around, looking around quite a bit." She then stopped in the Junior World department, took several items off the racks, and went into a fitting room.
The fitting rooms adjoined a narrow aisle and apparently had doors three feet high, with two-foot gaps above the floor and below the ceiling. Laskowski looked over or under the door and saw Deborah put the merchandise in her plastic bag or purse. As Deborah left the store without paying, Laskowski followed, detained her, and took her to the store's security office. While Laskowski was making out a "police report" Deborah volunteered that she was sorry and that her sister and brother told her she should do it to help pay the rent. Laskowski's eyewitness testimony and Deborah's statement were admitted over objection.

MIRANDA WARNING
(1a) Counsel urges that the finding as to the Orbach's theft is reversible per se because, before Deborah confessed to the detective, she was not advised as to her rights pursuant to Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] (rehg. den., 385 U.S. 890 [17 L.Ed.2d 121, 87 S.Ct. 11]).
(2a) Does Miranda govern custodial investigations by store detectives? That case concerned "the police" and "the authorities." California courts have limited its requirements (and those of the predecessor case, People v. Dorado (1965) 62 Cal.2d 338 [42 Cal. Rptr. 169, 398 P.2d 361], cert. den., 381 U.S. 937 and 946 [14 L.Ed.2d 702 and 710, 85 S.Ct. 1765]), to "law enforcement officials," their agents, and agents of the court, while the suspect is in official custody. (In re Eric J. (1979) 25 Cal.3d 522, 527 [159 Cal. Rptr. 317, 601 P.2d 549]; see People v. Polk (1965) 63 Cal.2d 443, 449 [47 Cal. Rptr. 1, 406 P.2d 641], cert. den. (1966) 384 U.S. 1010 [16 L.Ed.2d 1016, 86 S.Ct. 1914] [interrogation by prosecution psychiatrist]; In re Spencer (1965) 63 Cal.2d 400, 410 [46 Cal. Rptr. 753, 406 P.2d 33] [court-appointed psychiatrist]; see Estelle v. Smith (1981) 451 U.S. 454, 466-469 [68 L.Ed.2d 359, 371-373, 101 S.Ct. 1866] [same].)[1] (3) "`A private citizen *131 is not required to advise another individual of his rights before questioning him. Absent evidence of complicity on the part of law enforcement officials, the admissions or statements of a defendant to a private citizen infringe no constitutional guarantees. [Citations.] ...'" (Eric J., supra, at p. 527, quoting People v. Mangiefico (1972) 25 Cal. App.3d 1041, 1049 [102 Cal. Rptr. 449].)
(2b) Nongovernmental security employees that act without police cooperation have been regarded as private citizens unaffected by Miranda. (People v. Payne (1969) 1 Cal. App.3d 361, 365 [81 Cal. Rptr. 635]; People v. Crabtree (1966) 239 Cal. App.2d 789, 790 [49 Cal. Rptr. 285]; but cf. In re Victor F. (1980) 112 Cal. App.3d 673, 680-681 [169 Cal. Rptr. 455].) (1b) Police complicity in the usual sense is not at issue in this case. There is no evidence that McGinnis acted under any arrangement with the authorities, at their direction, or with their approval.
(2c) Counsel cites People v. Zelinski (1979) 24 Cal.3d 357 [155 Cal. Rptr. 575, 594 P.2d 1000] for the proposition that security guards who routinely use state-conferred powers of detention and arrest act under color of law as police agents. Therefore, it is argued, confessions they extract in custodial settings without Miranda protections must be excluded.
Zelinski, however, avoided holding that security guards are police surrogates for all juridical purposes. There, store detectives trespassed by exceeding the limited powers of private search granted by statute. We stressed that private security personnel "are not police" and have only the powers and privileges of other private persons, except as provided by statute. (P. 365.)
Nonetheless we saw state involvement where security personnel, acting routinely in aid of law enforcement, exceeded the narrow, state-conferred citizen's search privilege; and exclusion seemed an appropriate and effective way to deter such unlawful invasions within the growing private-security sector. (Pp. 366-368.) To hold otherwise, we said, would penalize police for wrongful searches but immunize those of *132 private security guards, when the conduct was illegal and deterrable in both situations. (P. 368.)
Zelinski's "color of law" analysis responded to arguments that illegal searches by private guards are not state action and thus are unaffected by the Fourth Amendment and article I, section 13 of the California Constitution. (Pp. 366-367.)[2] But the mere asking of questions is not illegal. And guarantees against self-incrimination do not turn solely on whether interrogators are state agents. Rather, they prevent the state from using involuntary answers as evidence (see Jackson v. Denno (1964) 378 U.S. 368, 385-386 [12 L.Ed.2d 908, 920-921, 84 S.Ct. 1774, 1 A.L.R.3d 1205]; People v. Varnum (1967) 66 Cal.2d 808, 812-813 [59 Cal. Rptr. 108, 427 P.2d 772], app. dism. and cert. den. (1968) 390 U.S. 529 [20 L.Ed.2d 86, 88 S.Ct. 1208]) whether obtained by government or private conduct (People v. Haydel (1974) 12 Cal.3d 190, 197 [115 Cal. Rptr. 394, 524 P.2d 866]). Statements obtained without manifest physical or psychological coercion usually are deemed voluntary, though defendant never knew or waived his rights to silence and counsel.
For policy reasons Miranda established a stricter definition of voluntariness when answers are obtained in an "official interrogation" of a suspect in police custody by "law enforcement officials" or with their complicity. (See Estelle v. Smith, supra, 451 U.S. at pp. 466-469 [68 L.Ed.2d at pp. 371-373]; Miranda, supra, 384 U.S. at p. 444 [16 L.Ed.2d at p. 706]; Eric J., supra, 25 Cal.3d at p. 527.) That private security guards sometimes act under color of law when they conduct illegal searches neither makes them "law enforcement officials" nor establishes the complicity of those officials for purposes of Miranda. It does not render their detention of shoplifting suspects "police custody" nor their questioning "official."
Miranda responded to the history of force, duress, and lengthy, incommunicado interrogation by some law enforcement agencies. (384 U.S. at pp. 444-456 [16 L.Ed.2d at pp. 706-713].) That abuse seems to have continued, at least in part. (See, e.g., People v. Pettingill, supra, 21 Cal.3d 231, 242-243.) The presence of overt police coercion is not, of *133 course, a prerequisite to application of Miranda. Courts recognize that nearly all police detention creates an atmosphere of compulsion. (Cf. Orozco v. Texas (1969) 394 U.S. 324, 326-327 [22 L.Ed.2d 311, 314-315, 89 S.Ct. 1095]; People v. Arnold, supra, 66 Cal.2d 438, 447-448.)
We think that routine detention and questioning by plainclothes store detectives present a substantially different situation. Unless they represent themselves as police they do not enjoy the psychological advantage of official authority, a major tool of coercion. Moreover, there appears little evidence of abusive techniques by store detectives similar to those that Miranda charged against the police.
Under California statutes store employees have only limited powers of detention. (Pen. Code, § 490.5, subd. (e)(1) [merchant may detain for reasonable time and investigation on probable cause]; § 847 [arresting citizen must deliver suspect to police or magistrate without unnecessary delay].) There is evidence that retailers exercise restraint; more than half the store representatives contacted in a national study said that store policy was to release most shoplifters without police involvement. (Merchants' Responses to Shoplifting: An Empirical Study (1976) 28 Stan.L.Rev. 589, 604 (hereafter Merchants' Responses).)[3] Thus, though detentions by store personnel may at times seem frightening, the "compelling atmosphere" that Miranda deemed inherent in a custodial interrogation by police and other government personnel appears diminished.
Miranda criticized police preference for confessions over independent investigation. (384 U.S. at pp. 447-448 [16 L.Ed.2d at pp. 708-709].) But citizens may not arrest for misdemeanors not committed in their presence. (Pen. Code, § 837, subd. 1.) And the study referred to above indicated that stores discourage detention and arrest of suspects not actually seen by store employees leaving the premises with unbought merchandise. (Merchants' Responses, supra, 28 Stan.L.Rev. at pp. 598-599.) (1c) That procedure was followed here. Before detaining Deborah, McGinnis saw her conceal several items, and then watched until she left the store without paying.
*134 (2d) Thus it appears that shoplifting convictions routinely may depend more on eyewitness testimony and physical evidence than on the suspect's inculpatory statements. Store detectives' incentive to extract confessions is diminished even when the basic intent is to prosecute. Should psychological or physical abuse produce a confession, the exclusionary remedy is of course available. (Haydel, supra, 12 Cal.3d at p. 197.)
Jurisdictions where the question now before us has arisen, including those that give to merchants the right to detain and question suspected shoplifters, generally have declined to extend Miranda to privately employed personnel.[4]
We concur with those rulings. (1d) We hold that McGinnis, a plainclothes private detective, was not required to follow Miranda procedures before eliciting incriminating statements for use against Deborah. We therefore uphold the trial court order sustaining the Orbach's petition.[5]

FITTING-ROOM SURVEILLANCE
(4a) Deborah also contends that the second petition, charging theft from a Broadway store, cannot be sustained. She urges that by watching her in the Broadway fitting room from the adjacent corridor, Laskowski, the store security guard, searched without probable cause, unconstitutionally. She seeks suppression of the fruits of Laskowski's observations, including the stolen merchandise subsequently recovered outside the store.
We find it unnecessary to decide whether prearrest searches by private-store detectives raise constitutional issues or whether the exclusionary rule can be applied to evidence obtained in a search of that kind. (Cf. People v. Zelinski, supra, 24 Cal.3d 357, 365-368; People v. Triggs (1973) 8 Cal.3d 884, 891-892 [106 Cal. Rptr. 408, 506 P.2d *135 232], disapproved on other grounds, People v. Lilienthal (1978) 22 Cal.3d 891, 896 [150 Cal. Rptr. 910, 587 P.2d 706].) The trial court apparently ruled that no search occurred here because Laskowski's observations did not infringe Deborah's reasonable expectation of privacy.[6] The record provides substantial, factual support for that determination. (See People v. Rios (1976) 16 Cal.3d 351, 357 [128 Cal. Rptr. 5, 546 P.2d 293]; People v. Superior Court (1974) 10 Cal.3d 645, 647, 649-650 [111 Cal. Rptr. 565, 517 P.2d 829]; People v. Lawler (1973) 9 Cal.3d 156, 160 [107 Cal. Rptr. 13, 507 P.2d 621].)
(5a) Law enforcement officials make a search within the purview of constitutional prohibitions only when they jeopardize an individual's expectation of privacy that society has recognized as justified. There is no reasonable expectation with regard to objects or events in plain view from a public place where the observer has a right to be. (Lorenzana v. Superior Court (1973) 9 Cal.3d 626, 634 [108 Cal. Rptr. 585, 511 P.2d 33]; People v. Bradley (1969) 1 Cal.3d 80, 84 [81 Cal. Rptr. 457, 460 P.2d 129]; People v. Lovelace (1981) 116 Cal. App.3d 541, 548 [172 Cal. Rptr. 65]; see Katz v. United States (1967) 389 U.S. 347, 351-353 [19 L.Ed.2d 576, 581-583, 88 S.Ct. 507].)
(4b) The record indicates that the fitting rooms at the Broadway store open off a three-foot-wide corridor. Each is about four by five feet square in area and has a door about three feet high from bottom edge to top edge, with approximately two-foot gaps above and below. Thus the door's design allows substantial portions of the small room's interior to be seen from the corridor.
When Laskowski began to suspect Deborah she followed her into the corridor, watching as she entered a fitting room and closed the door. On cross-examination she testified that Deborah hung her purse or shopping bag on the doorknob, then placed it on the floor and began stuffing it with clothing taken from the rack. Counsel pressed for an admission that Laskowski had seen this by walking up to the door, then stretching or bending to peer over or under it. Though susceptible to varying interpretations, Laskowski's answers sustain the inference that once placed *136 on the floor the purse or bag was visible to a person standing normally in the corridor and was seen from such a position.[7]
It appears that this was the dispositive basis of the trial court's ruling. Seeking suppression, Deborah's counsel argued that "[t]here is an expectation of privacy when one enters into a dressing room and closes the dressing room because the courts have held that that person upon entering the dressing room has an expectation of privacy; that a security officer looking into the room thereafter violates that expectation of privacy...." The judge responded that he knew of a case where a guard had looked into a dressing room with a slatted door; a suppression motion had been overruled there because "there was no expectation of privacy." Though counsel and the judge also discussed differences between government and business security forces, we think the expectation-of-privacy *137 doctrine was an independent reason why the judge denied the suppression motion here.[8]
(5b) What constitutes a "reasonable" expectation of privacy depends on the circumstances and is measured by common habits in the use of domestic and business properties. (E.g., North v. Superior Court (1972) 8 Cal.3d 301, 308-312 [104 Cal. Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155]; People v. Lovelace, supra, 116 Cal. App.3d 541, 550; People v. Sneed (1973) 32 Cal. App.3d 535, 540 [108 Cal. Rptr. 146].) (4c) The fitting room here adjoined a narrow common corridor through which customers and salesclerks must have passed frequently. They would not always keep strictly to the center of the passageway, and slight deviations must have brought them close to the fitting-room doors. The large gaps above and below the doors provided an obvious view of the interior of each room. Though designed perhaps to give minimal protection to modesty, the doors hardly could promote any reasonable feeling that all actions and objects behind them were insulated from public observation.
Citing People v. Triggs, supra, 8 Cal.3d 884, counsel suggests that fitting rooms, like public restrooms, are zones of complete privacy regardless of their construction or the means of observation. But Triggs held only that a public restroom gives rise to a reasonable expectation of freedom from observation by a law enforcement officer who has assumed a clandestine, unexpected vantage point to spy indiscriminately on all who enter. In those circumstances it does not matter that a stall's construction offers little privacy from normal view or that the officer could have seen the interior from a place open to the public. (Pp. 891-892; see also Britt v. Superior Court (1962) 58 Cal.2d 469, 471-472 [24 Cal. Rptr. 849, 374 P.2d 817]; Bielicki v. Superior Court (1962) 57 *138 Cal.2d 602, 605-607 [21 Cal. Rptr. 552, 371 P.2d 288]; People v. Metcalf (1971) 22 Cal. App.3d 20, 22-24 [98 Cal. Rptr. 925].)[9]
The only California decision suggesting a limitation on surveillance of fitting rooms also involved observation from a hidden and unusual position. People v. Randazzo (1963) 220 Cal. App.2d 768 [34 Cal. Rptr. 65] concluded (in dictum) that police could not have watched a fitting room by lying on the floor of an adjacent cubicle to peer through a narrow gap below the dividing partition. (Pp. 769-770; cf. People v. Moreno (1976) 64 Cal. App.3d Supp. 23, 29-30 [135 Cal. Rptr. 340].)
Retailers face a shoplifting epidemic. (See U.S. Law Enforcement Assistance Administration, Security and the Small Retailer (1979) p. 11; Merchants' Responses, supra, 28 Stan.L.Rev. 589.) The fitting rooms they often provide for customer convenience and modesty are particularly suited to concealment of stolen property. One way to fight that problem is to provide facilities that shield intimate body parts but are not entirely hidden from view. In effect, counsel asks us to hold that stores may not use evidence obtained by their employees' normal-view observations through fitting room doors whose design and location almost invite inspection. (5c) (See fn. 10.) That rule would comport with neither common habits in the use of property nor wise policy.[10]
*139 One who uses a dressing room is entitled to the modicum of privacy it appears to afford. The record here supports the inference that Deborah placed the purse or bag on the floor of the room, where it was seen in full view of any passing customer, salesclerk, or security guard. No constitutionally recognized expectation of privacy proscribes that observation, and it appears that the trial court so ruled. Thus no ground appears for disturbing its order denying suppression of the evidence obtained.

POSTDETENTION SEARCHES
(6) After the People had urged on appeal that any Miranda error or illegal surveillance was harmless in view of the recovery of the stolen items, Deborah argued for the first time that all postdetention searches leading to such recovery were themselves improper. She further noted that the record does not show any recovery of property in the Broadway incident. If proof of recovery is suppressed or was omitted, she reasons, there is insufficient evidence to sustain either petition.
Yet did she not waive the invalidity of postdetention searches by not raising the issue in juvenile court? (Cf. People v. Pranke (1970) 12 Cal. App.3d 935, 942 [91 Cal. Rptr. 129].) In any event the eyewitness testimony of the detectives is overwhelming evidence of guilt, and any improper admission or omission of the recovered property seems harmless beyond a reasonable doubt.

*140 CUSTODIAL CREDITS
(7) Deborah urges that the trial court erred in denying her 32 days of detention credit for time spent in juvenile hall before the disposition hearing. The contention has merit. The period of confinement under the Juvenile Court Law may not exceed the maximum term of imprisonment for a person convicted of the same offenses in adult court. (Welf. & Inst. Code, § 726.) Predisposition custodial credit therefore must be given to the extent the minor's total period of confinement would otherwise exceed the statutorily defined "maximum term of imprisonment" for one convicted as an adult. (In re Eric J., supra, 25 Cal.3d 522, 535-536.) Where sentences are aggregated for multiple offenses Eric J. provides that the maximum adult term is to be computed under the determinate sentencing law whether the offenses be felonies or misdemeanors. (Id., at pp. 536-538.)
At the disposition hearing the court assessed a total of eight months' confinement for the two petty thefts. Under Eric J. the maximum term of adult confinement for the same offenses would be six months (the "upper term" for the base offense (Pen. Code, §§ 488, 490.5, subd. (a)) plus two months (one-third of the "middle term" for the subordinate offense; id., § 1170.1, subd. (b); see Eric J., supra, at p. 538), or eight months, the period of confinement actually imposed. Thus we must modify the judgment to include the credit requested.
The judgment is modified to credit Deborah with 32 days of detention credit for time spent in juvenile hall prior to her dispositional hearing. In all other respects, the judgment is affirmed.
Tobriner, J., Richardson, J., and Wiener, J.,[*] concurred.
BIRD, C.J.
I concur in the majority opinion. However, I write separately to emphasize that the principles herein enunciated do not apply to off-duty police officers who work part time as security guards for private businesses. The majority's holding is limited to a determination that the policies which underlie the Miranda decision do not extend to private security guards.
Unlike the private security guard, a police officer is under a continuing duty to protect the public. (See Pen. Code, §§ 830.1 and 836; *141 People v. Derby (1960) 177 Cal. App.2d 626 [2 Cal. Rptr. 401].) The fact that police officers may work part time for private businesses should not relieve them of their obligation to give Miranda warnings before conducting a custodial interrogation.
The logic of this distinction is borne out when two sets of facts are compared.[1] An off-duty police officer enters a store as a customer and sees someone in the act of shoplifting. The officer places the suspect under arrest. The Constitution requires that Miranda warnings be given before questioning the suspect about the incident. (See State v. Willadson (1978)  Minn.  [268 N.W.2d 546, 546-547].) Similarly, an off-duty police officer, who is working as a security guard, observes someone shoplifting an item from the store and arrests him. In both instances the police officer seeks to question a suspect about criminal activity. If the second officer is not required to give Miranda warnings simply because he is working as a security guard, then the decision as to when basic constitutional principles apply will turn on who is paying the officer's salary at the time he questions the arrestee. Surely, the constitutional rights of our citizens should not hinge on such a silly, irrational distinction.
MOSK, J.
I concur in the majority opinion. I also agree with the views expressed in the concurring opinion of the Chief Justice. However, I would add another caveat, consistent with the conclusion I expressed for this court in Dyas v. Superior Court (1974) 11 Cal.3d 628 [114 Cal. Rptr. 114, 522 P.2d 674].
I would invoke the folk wisdom that if an object looks like a duck, walks like a duck and quacks like a duck, it is likely to be a duck. If a security officer in an establishment open to the public dresses like a peace officer, carries a gun and a simulated badge or shoulder emblem like a peace officer, and conducts himself in the authoritative manner of a peace officer, he surely will be deemed in the eyes of the public and detained suspects to be the equivalent of a peace officer. He should be held to the obligations imposed by law upon a peace officer.
*142 In Dyas, for example, the uniformed private security officer "was armed with a revolver, carried handcuffs, and had a two-way radio in his patrol car. Nor did he hesitate to use these indicia of authority in the manner in which they were intended. As we have seen, he radioed for a `back-up unit,' ordered defendant to stand spreadeagled against a wall, conducted a pat-down search of defendant's clothing, drew his gun when defendant resisted, arrested and handcuffed defendant on finding contraband, and held him in custody in the patrol car until assistance arrived. Clearly these are the acts of a law enforcement officer." (Id. at pp. 633-634.)
Since no such circumstances appear in the instant case, I reach the same result as do my colleagues in the majority.
Staniforth, J.,[*] concurred.
NOTES
[1] Thus in People v. Arnold (1967) 66 Cal.2d 438 [58 Cal. Rptr. 115, 426 P.2d 515] this court adopted Miranda's definition of a custodial interrogation as "one initiated by law enforcement officers" after the suspect has been deprived of freedom. (P. 448.) In People v. Pettingill (1978) 21 Cal.3d 231 [145 Cal. Rptr. 861, 578 P.2d 106] we reiterated that "[t]he Miranda decision was premised on the perception that interrogation of a suspect in police custody is inherently coercive...." (P. 237.)
[2] We express no opinion on whether article I, section 13 applies only to state action. (Cf. Gay Law Students Assn. v. Pacific Tel. & Tel. Co. (1979) 24 Cal.3d 458, 468 [156 Cal. Rptr. 14, 595 P.2d 592].)
[3] Such policies probably are motivated by stores' desire to attain customer goodwill and to avoid civil liability, aims less influential with the police. (Merchants' Responses, supra, at pp. 600-602; Comment, Private Police Forces: Legal Powers and Limitations (1971) 38 U.Chi.L.Rev. 555, 569.)
[4] E.g., United States v. Casteel (10th Cir.1973) 476 F.2d 152, 154-155; United States v. Birnstihl (9th Cir.1971) 441 F.2d 368, 370; United States v. Antonelli (2d Cir.1970) 434 F.2d 335, 337; People v. Raitano (1980) 81 Ill. App.3d 373 [36 Ill.Dec. 597, 401 N.E.2d 278, 280-281]; Silks v. State (1976) 92 Nev. 91 [545 P.2d 1159, 1161-1162]; State v. Calcagno (1972) 120 N.J. Super. 536 [295 A.2d 366, 367]; State v. Bolan (1971) 27 Ohio St.2d 15 [56 Ohio Ops.2d 8, 271 N.E.2d 839, 841-843].
[5] Nothing in this opinion is intended to imply any disapproval or limitation of our analysis in Zelinski.
[6] The suppression motion was combined with the jurisdictional hearing. The juvenile judge made only a summary oral ruling; formal findings and conclusions were not made or requested. Therefore the basis of the ruling must be inferred from the whole record.
[7] Counsel's examination on this issue was as follows:

"Q. [by Mr. Kapit] You walked over there. You said you looked over the top of it?
"A. When I heard  I heard 
"Q. Is that correct?
"A.  open the purse I looked in and observed 
"Q. Prior to hearing the purse, did you have the intent to go over there and look over to see what was happening?
"A. Yes.
"Q. As a matter of fact, the minor closed the door and if you were walking normally, could look into the room?
"A. Yes.
"Q. But you didn't. You had to stand up or look over.
"A. The purse was sitting on the floor.
"Q. So you had to bend down underneath to look under?
"A. I could see from either direction.
".... .... .... .... . .
"Q. Where was the purse? Directly in front of the door or against the wall in the back?
"A. It was sort of  I don't recall exactly where.
"Q. Sure her purse wasn't hanging up on the rack?
"A. It was originally hanging up. She had put it down and  when she put the merchandise in.
"Q. You originally  Your testimony is that the purse was originally hanging on the wall.
"A. It was hanging on the doorknob of the door. She took it off the doorknob, set the purse on the floor where she opened it up, dropped the merchandise in.
"Q. Then closed it?
"A. Right.
"Q. Where were you standing during this?
"A. I was standing in the aisle.
"Q. Were you peering down onto her?
"A. I was looking under. When I saw it went on the floor, I looked across. I could see the purse. I looked under the door."
[8] The judge said, "The only case I am familiar with is People vs Greenberg where it involved I believe Bullock's. It had the slats in the door, and the court indicated that there was a motion under 1538.5 in that regard. The court overruled it and said that there was no expectation of privacy. And again they analogized it to the security officer and the right to the invasion of privacy as opposed  between a police officer and a security officer." (Italics added.) Had the judge intended to rule simply that surveillance by private security guards does not violate the Constitution there would have been no need to note the construction of the particular fitting room at issue.

In any event, since Deborah waived formal findings and conclusions by failing to request them we may presume on a silent or ambiguous record that the court informally made all findings in support of the judgment for which there is substantial evidence. (E.g., Beehan v. Lido Isle Community Assn. (1977) 70 Cal. App.3d 858, 861 [137 Cal. Rptr. 528]; see Rodriguez v. Municipal Court (1972) 25 Cal. App.3d 521, 525 [102 Cal. Rptr. 45].)
[9] Triggs and Metcalf rely in part on Penal Code section 653n, enacted in 1970, which prohibits installation of two-way mirrors in specified places, including "any restroom, toilet, bathroom, washroom, shower, locker room, fitting room, motel room, or hotel room...." In an ambiguous passage Triggs said that the statute's legislative history indicates an intent to declare "areas within which the public can `reasonably expect to be free from being observed.' ..." (8 Cal.3d at p. 894, fn. 6 [italics in original], quoting from Assem. Bill No. 1222 (1969 Reg. Sess., Mar. 25, 1969).) But section 653n is limited to a method of hidden spying; Metcalf held only that the statute expresses a legislative policy against "clandestine observation of public restrooms," rendering it "reasonable for users thereof to expect that their privacy will not be surreptitiously violated." (22 Cal. App.3d at p. 23 [italics added].) The Triggs language, read in context, implies no belief that restrooms and fitting rooms are immune from all observation.
[10] The privacy one may reasonably expect can depend, of course, on the identity of the intruder or the purpose or intensity of the intrusion. (E.g., Katz, supra, 389 U.S. 347, 352-353 [19 L.Ed.2d 576, 582-583] [use of phone booth is not consent to electronic surveillance of otherwise inaudible conversation]; Stoner v. California (1964) 376 U.S. 483, 489 [11 L.Ed.2d 856, 860, 84 S.Ct. 889] [consent to entry of hotel room by hotel employees for hotel purposes is not consent to entry by police]; Triggs, supra, 8 Cal.3d 884, 891-892 [use of viewable restroom stall no consent to hidden surveillance]; People v. Krivda (1971) 5 Cal.3d 357, 367 [96 Cal. Rptr. 62, 486 P.2d 1262], cert. den. (1973) 412 U.S. 919 [37 L.Ed.2d 145, 93 S.Ct. 2734] [possibility that abandoned trash will be sifted by refuse collectors, vagrants, or children does not vitiate privacy from police search], overruled on other grounds, Madril v. Superior Court (1975) 15 Cal.3d 73, 77 [123 Cal. Rptr. 465, 539 P.2d 33] and People v. Kaanehe (1977) 19 Cal.3d 1, 10-11 [136 Cal. Rptr. 409, 559 P.2d 1028]; People v. McGrew (1969) 1 Cal.3d 404, 410-411 [82 Cal. Rptr. 473, 462 P.2d 1], cert. den. (1970) 398 U.S. 909 [26 L.Ed.2d 67, 90 S.Ct. 1689] [shipper's consent to airline inspection of footlocker is not consent to police search], overruled on other grounds, People v. McKinnon (1972) 7 Cal.3d 899, 907-911 [103 Cal. Rptr. 897, 500 P.2d 1097]; People v. Arno (1979) 90 Cal. App.3d 505, 510-512 [153 Cal. Rptr. 624] [opening of premises to naked eye is not consent to use of optical aid to see what would otherwise be invisible]; People v. Brown (1979) 88 Cal. App.3d 283, 289-292 [151 Cal. Rptr. 749] [patient's consent to presence of hospital employees does not waive expectation of privacy from police intrusion into hospital room].)

That rule reaffirms that one need expect only the expectable and is not forced to guard against all possible types of government intrusion before the law will recognize a reasonable expectation of privacy. (See 1 LaFave, Search and Seizure (1978) § 2.3, p. 303; Amsterdam, Perspectives On The Fourth Amendment (1974) 58 Minn.L.Rev. 349, 402.) But unaided, plain-view observations from a legitimate public position are not foreclosed simply because the observer was an agent of law enforcement. (See, e.g., People v. Bradley, supra, 1 Cal.3d 80, 85 [marijuana plant in fenced backyard seen by officers standing where "delivery men and others [presumably] came"].) Nor does the Constitution preclude systematic surveillance from a vantage point frequented by the public. (See, e.g., Triggs, supra, 8 Cal.3d 884, 894, fn. 7 and cases cited; Jacobs v. Superior Court (1973) 36 Cal. App.3d 489, 496-497 [111 Cal. Rptr. 449].)
[*] Assigned by the Chairperson of the Judicial Council.
[1] This court has held that an off-duty police officer acting as a privately employed security guard was not engaged in the performance of his official duties for purposes of Penal Code section 243 or for purposes of a suit for false arrest and imprisonment. (People v. Corey (1978) 21 Cal.3d 738 [147 Cal. Rptr. 639, 581 P.2d 644] and Cervantez v. J.C. Penney Co. (1979) 24 Cal.3d 579 [156 Cal. Rptr. 198, 595 P.2d 975].) However, neither decision dealt with the obligation of a police officer to conform his actions to the requirements of the Constitutions of this state and nation. That question has never been addressed by this court.
[*] Assigned by the Chairperson of the Judicial Council.