[Crim. No. 17143. Fourth Dist., Div. Three. Dec. 12, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
ROGER BRIAN ABBOTT, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976(b), parts I, II and IV are not published, as they do not meet the standards for publication.

636

**COUNSEL**

Keith C. Monroe for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, A.

Wells Petersen and Janelle B. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**SONENSHINE, J.**—A jury convicted defendant Roger Brian Abbott of conspiracy to sell or transport drugs. (Pen. Code, § 182, subd. 1; Health & Saf. Code, § 11352.) On appeal he contends the trial court erroneously denied his motions seeking to suppress evidence seized pursuant to several search warrants (§§ 1538.5-1540) and attacks the sufficiency of the evidence. We affirm.

Abbott and his brother-in-law Mark Mead were involved in a cocaine distribution business. Between November 3, 1981, and December 29, 1981, law enforcement officers surveilled a women's clothing store, the Jealous Ear Boutique. Several times they saw Abbott and Mead together at the boutique. The two usually arrived in the early evening, after normal business hours. On four occasions the officers saw Abbott arrive between 5:30 and 6 p.m.; he stayed approximately 45 minutes and carried a black shoulder bag into and out of the boutique. Mead carried a similar bag.

The officers also noticed an unusual pattern to the boutique's clientele. The traffic was five times greater in the evening than in the day. The daytime customers were predominantly female while at night they were primarily male.

The officers obtained search warrants for the Jealous Ear Boutique as well as Mead's person, car and residence. They served these warrants on January 21, 1982, and recovered 1,523 grams of cocaine and a ledger book from Mead's car. At trial Glenn Foreman testified entries in the book reflected monies he owed to Mark Mead for cocaine he had purchased from him at the Jealous Ear Boutique between April 1981 and February 1982.

An officer recovered a locksmith's business card from Mead's pocket with a lock combination written on one side. Later that day the locksmith told the officers he had, in the presence of Mead, changed a floor safe's combination at Abbott Magnetics on January 21, 1982, and gave Mead the business card.

And to complete the day's activities, Foreman received, presumably before Mead's arrest, a quantity of cocaine from Mead. Foreman was to pay him later.

The next day the officers served a search warrant on Abbott's place of business, Abbott Magnetics. The officers seized a sport bag containing cocaine from a safe. There was also a note inside the bag, near the cocaine, which said, "This is what Roger has been getting." Through expert testimony the prosecution established the handwriting on the note was Mead's.

The officers obtained a search warrant for Abbott's residence. They served it on January 26, 1982, and recovered a ledger from the filter compartment of a vacuum cleaner found in the garage. One of the investigators testified as an expert that entries in the two ledgers signified "Roger" was purchasing cocaine from "Mark" and then reselling it.

Between January 21, 1982, and February 9, 1982, Glenn Foreman met with law enforcement officers investigating Mead and Abbott. Foreman arranged with Mead to meet again so he could pay Mead for the January 21 quantity of cocaine and purchase more cocaine. This transaction was culminated on February 9, 1982, and Mead was again arrested. Officers took $1,200 from him in recorded money they had earlier given Foreman to consummate the purchase.

## I*

. . . . . . . . . . . . . . . . . . . . . . .

## III[6]

▮▮▮ Abbott urges the locksmith's revelation of the location of the safe to law enforcement officers without a search warrant violated his constitutional right to privacy.[7] He argues this violation invalidates the Abbott Mag-

---

*See footnote 1, *ante,* page 635.

[6]This section is certified for publication.

[7]Abbott relies on the constitutional right to privacy recognized in California Constitution, article I, section 1, which provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." However, the applicable cases, as we discuss *post,* rely on California Constitution, article I, section 13, which provides: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated; and a warrant may not issue except on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized." We too analyze whether the law enforcement activity in the present case constituted an unreasonable search and seizure inasmuch as it was accomplished without a warrant. We are not persuaded the right to privacy cases Abbott cites (see *Valley Bank of Nevada* v. *Superior Court* (1975) 15 Cal.3d 652 [125 Cal.Rptr. 553, 542 P.2d 977]; *Dompeling* v. *Superior Court* (1981) 117 Cal.App.3d 798 [173 Cal.Rptr. 38]) apply in the present context.

netics warrant and, in turn, taints the warrant for his residence. We disagree.

Three California Supreme Court cases guide us in resolving this issue— *People* v. *Chapman* (1984) 36 Cal.3d 98 [201 Cal.Rptr. 628, 679 P.2d 62]; *People* v. *Blair* (1979) 25 Cal.3d 640 [159 Cal.Rptr. 818, 602 P.2d 738]; and *Burrows* v. *Superior Court* (1974) 13 Cal.3d 238 [118 Cal.Rptr. 166, 529 P.2d 590]. In *Burrows,* the Supreme Court held a bank depositor has a reasonable expectation a bank will maintain the confidentiality of the depositor's records. As a general rule, such papers cannot be provided to law enforcement officers without the aid of legal process.[8] In *Blair* the court recognized a similar expectation of privacy in the records of charges by a credit card holder and in a list of telephone calls made from a hotel room.[9] Hence these records could not be secured without legal process. *Blair* primarily relies on *Burrows.* (See also *People* v. *McKunes* (1975) 51 Cal.App.3d 487 [124 Cal.Rptr. 126].) In *Chapman* the Supreme Court held law enforcement officers could not obtain a telephone subscriber's unlisted name, address and telephone number from company records without the aid of legal process. *Chapman,* in turn, primarily relies on *Burrows* and *Blair.*

The rationale behind recognizing a reasonable expectation of privacy with respect to the sort of information at issue in *Burrows, Blair* and *Chapman* is encapsuled in this passage from *Burrows*: "The underlying dilemma in this and related cases is that the bank, a detached and disinterested entity, relinquished the records voluntarily. But that circumstance should not be crucial. For all practical purposes, the disclosure by individuals or business firms of their financial affairs to a bank is not entirely volitional, since it is impossible to participate in the economic life of contemporary society without maintaining a bank account. In the course of such dealings, a depositor reveals many aspects of his personal affairs, opinions, habits and associations. Indeed, the totality of bank records provides a virtual current biography. While we are concerned in the present case only with bank statements, the logical extension of the contention that the bank's ownership of records permits free access to them by any police officer extends far beyond such statements to checks, savings, bonds, loan applications, loan guarantees, and all papers which the customer has supplied to the bank to facilitate the conduct of his financial affairs upon the reasonable assumption that the information would remain confidential. To permit a police officer access to

---

[8]We note, in passing, the United States Supreme Court finds no protectable Fourth Amendment interest in such records. (*United States* v. *Payner* (1980) 447 U.S. 727 [65 L.Ed.2d 468, 100 S.Ct. 2439].)

[9]As *Blair* itself notes (*id.,* at p. 654), the United States Supreme Court also takes a different view on the expectation of privacy in telephone records. (*Smith* v. *Maryland* (1979) 442 U.S. 735 [61 L.Ed.2d 220, 99 S.Ct. 2577].)

these records merely upon his request, without any judicial control as to relevancy or other traditional requirements of legal process, and to allow the evidence to be used in any subsequent criminal prosecution against a defendant, opens the door to a vast and unlimited range of very real abuses of police power." (*Burrows* v. *Superior Court, supra,* 13 Cal.3d 238, 247.)

In *Blair* the court noted "[n]o less than a bank statement, the charges made on a credit card may provide 'a virtual current biography' of an individual. [Citation.]" (*People* v. *Blair, supra,* 25 Cal.3d 640, 652.) The *Chapman* opinion does the same. "In many cases, [the government] is seeking the name and address of a person in order to provide an essential link to establish a 'virtual current biography.' [Citation.] Thus, protection of the individual's name and address is the only way to protect the 'virtual current biography.'" (*People* v. *Chapman, supra,* 36 Cal.3d 98, 110.)

■ Certain general principles guide our resolution of Abbott's contention. "[T]he standard for determining what is an illegal search is whether defendant's 'reasonable expectation of privacy was violated by unreasonable governmental intrusion.' [Citations.]" (*People* v. *Triggs* (1973) 8 Cal.3d 884, 891 [104 Cal.Rptr. 408, 506 P.2d 232], disapproved on other grounds, *People* v. *Lilienthal* (1978) 22 Cal.3d 891, 896 [150 Cal.Rptr. 910, 587 P.2d 706].) "What constitutes a 'reasonable' expectation of privacy depends on the circumstances . . . ." (*In re Deborah C.* (1981) 30 Cal.3d 125, 137 [177 Cal.Rptr. 852, 635 P.2d 446].)

■ Abbott argues the location of a safe for security reasons carries a high expectation of privacy. As a general proposition, this is true. We would not expect a locksmith to routinely give information about the location of a safe or related matters to the general public. ■ But "[t]he privacy one may reasonably expect can depend, of course, on the identity of the intruder or the purpose or intensity of the intrusion. [Citations.]" (*Id.,* at p. 138, fn. 10.)

■ The concerns expressed in *Burrows* and its progeny are not present here. Abbott and Mead's use of a locksmith was entirely volitional in the sense that term is used in *Burrows.* Retaining a locksmith's services is certainly not a prerequisite to participating in contemporary society. Dealing with a locksmith, one does not "reveal . . . many aspects of his [or her] personal affairs, opinions, habits and associations." We cannot conclude the location of a safe has anything to do with providing government a "virtual current biography." Nor do we envision revealing such information opening "the door to a vast and unlimited range of very real abuses of police power." The information is of an entirely different character emanating from a different *type* of source than that involved in *Burrows, Blair* and *Chapman.*

(See, e.g., *People* v. *Cohen* (1976) 59 Cal.App.3d 241, 245 [130 Cal.Rptr. 656]; *People* v. *Cain* (1971) 15 Cal.App.3d 687, 694 [93 Cal.Rptr. 388].)

The locksmith was a *witness* in a criminal investigation.[10] Witnesses often receive information from a suspect or observe events which the suspect expects to be held in the strictest confidence. But, as the United States Supreme Court has said, "Neither this Court nor any member of it has ever expressed the view the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." (*Hoffa* v. *United States* (1966) 385 U.S. 293, 302 [17 L.Ed.2d 374, 382, 87 S.Ct. 408]; see also *People* v. *Mastin* (1981) 115 Cal.App.3d 978, 987 [171 Cal.Rptr. 780]; *People* v. *Metzger* (1971) 22 Cal.App.3d 338, 343 [99 Cal.Rptr. 264].)

The same reasoning applies here to article I, section 13 of our state Constitution. Although the information did not directly concern "wrongdoing" confided to the locksmith, it was relevant to a criminal investigation. Abbott in essence evinces a misplaced belief the locksmith would never reveal the information, at least without legal process. But this belief does not by its mere existence give rise to a cognizable constitutional protection. "Law enforcement officials make a search within the purview of constitutional prohibitions only when they jeopardize *an individual's* expectation of privacy that *society has recognized as justified.*" (*In re Deborah C., supra,* 30 Cal.3d 125, 135, italics added.)

 Society is not prepared to recognize an expectation of privacy in the location of a safe when law enforcement properly seeks the information during the course of an investigation.[11] Were we to hold otherwise, the permissible scope of warrantless criminal investigation would be unreasonably hampered by malefactors' desire to keep virtually every aspect of their illegal enterprises out of government view. There was no proscription against confirming the location of the safe from the locksmith, a knowledgeable witness. *Burrows, Blair* and *Chapman* do not apply under these circumstances. The search warrants did not rely on illegally seized evidence.[12]

---

[10]In fact, he was a witness at trial.

[11]The law enforcement officers here were not on a "fishing expedition." They lawfully possessed the combination to the safe and already suspected the safe was in one of the locations discovered during the surveillance. The locksmith merely *confirmed* the location of the safe upon inquiry by one of the officers.

[12]Abbott also makes much of the fact the officers represented to the locksmith they already had a search warrant for the safe when this was not the case. Assuming, arguendo, the officers made such a representation, this does not change the result. The locksmith's testimony reveals it is doubtful, at best, any such statement *forced* him to give information he would not otherwise have given. Rather, he indicated it was the authority of the officers to

■ The doctrine of inevitable discovery (see *Nix* v. *Williams* (1984) 467 U.S. 431 [81 L.Ed.2d 377, 104 S.Ct. 2501]; *People* v. *Superior Court (Tunch)* (1978) 80 Cal.App.3d 665 [145 Cal.Rptr. 795]) has application here, although our resolution of Abbott's primary contention means we are not compelled to resort to this doctrine. The officers *had* the combination to the safe without the aid of the locksmith. They also had probable cause to believe the safe contained evidence concerning a conspiracy to distribute cocaine. The combination came from Mark Mead's pocket when he was arrested with a large quantity of the drug. Abbott Magnetics was *one* of the locations which had come to the officers' attention.

The officers merely wanted to confirm the safe's location. The locksmith's testimony indicates the officers asked if the safe was located at Abbott Magnetics and he told them it was. He was able to pinpoint the location of the safe to permit the officers to obtain a search warrant specifically for Abbott Magnetics rather than *several* locations for which they had probable cause to believe a safe with evidence of the conspiracy might be located. (See *People* v. *Sanchez* (1982) 131 Cal.App.3d 323, 331-332 [182 Cal.Rptr. 430].) The officers had probable cause to search Abbott's business without the locksmith's information.

IV*

. . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Wallin, Acting P. J., and Crosby, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 14, 1985. Mosk, J., was of the opinion that the petition should be granted.

---

which he was responding. In addition, the determinative issue is whether the officers had a right to the information the locksmith had without a warrant, not the method used to extract the information. Abbott has cited no case applying any sanction in this context for any misstatement, innocent or malicious, assuming there was one.

*See footnote 1, *ante,* page 635.