Filed 7/22/22 In re S.O. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
### THIRD APPELLATE DISTRICT
(Shasta)

----

| | |
|---|---|
| In re S.O., a Person Coming Under the Juvenile Court Law. | C093904 |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>S.O.,<br><br>Defendant and Appellant. | (Super. Ct. No. SCRDJDSQ20311310305) |

Minor S.O. was adjudged a ward of the Shasta County Juvenile Court and committed to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ). On appeal, the minor contends the juvenile court erred in committing him to DJJ and in setting the maximum term of confinement. The Attorney General concedes the maximum term of confinement should be reduced. We shall reduce the maximum term of confinement to seven years eight months and otherwise affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

This minor is the subject of five separate petitions. On November 30, 2017, the District Attorney of Shasta County filed the first petition pursuant to Welfare and Institutions Code section 602, subdivision (a).[1] The petition alleged one count of vandalism (Pen. Code, § 594, subd. (b)(1)); three counts of resisting, obstructing, or delaying a peace officer in the performance of his or her duties (Pen. Code, § 148, subd. (a)(1)); and one count of petty theft (Pen. Code, §§ 484, subd. (a), 488).

In the first incident, the minor kicked the inside of the patrol car and spit all over it. In a second unrelated incident, the minor tried to steal an MP4 player from a store.

The minor admitted the vandalism as a misdemeanor and one count of resisting, obstructing, or delaying a peace officer in the performance of his or her duties. The juvenile court declared the minor a ward of the court and placed him on probation with three days' custody in juvenile hall with three days' credit for time served.

On April 26, 2018, the district attorney filed a second petition. This petition alleged one count of vandalism (Pen. Code, § 594, subd. (b)(1)); and three counts of resisting, obstructing, or delaying a peace officer in the performance of his or her duties (Pen. Code, § 148, subd. (a)(1)). The petition also alleged the minor should be placed in a more restrictive placement pursuant to section 777, subdivision (a).

This time, after attending a counseling appointment, the minor started punching the dashboard of his mother's car and damaging it. The mother brought him to the probation department. When he got out of the car under the control of one probation officer, he tried to punch another probation officer.

The minor admitted one count of vandalism as a misdemeanor and one count of resisting, obstructing, or delaying a peace officer in the performance of his or her duties,

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code. The remaining petitions were similarly filed under section 602, subdivision (a).

2

and admitted he should be placed in a more restrictive placement. The court continued the minor as a ward of the court and ordered him to serve 21 days in juvenile hall with credit for 21 days served.

On September 28, 2018, the district attorney filed a third petition. This petition alleged one count of assault with a deadly weapon on a peace officer (Pen. Code, § 245, subd. (c)); one count of making a criminal threat (Pen. Code, § 422); and one count of resisting, obstructing, or delaying a peace officer in the performance of his or her duties (Pen. Code, § 148, subd. (a)(1)). The petition also alleged the minor should be placed in a more restrictive placement pursuant to section 777, subdivision (a).

In this third case, the minor reported to the probation office to turn in his monthly report. The report was filled with profanity and his probation officer rejected it. When he sat down with the probation officer to discuss the report, the minor threatened to " 'beat some ass' " and " 'do stuff [he] shouldn't do.' " The minor then said, " 'I'm gonna fuck you up,' " reached into his pocket, pulled out a folding knife, and flung it open. Officers disarmed him.

The minor admitted the charge of assault with a deadly weapon on a probation officer and the probation violation. The juvenile court resolved the disposition of this petition concurrently with the disposition of the fifth petition, discussed *post,* with an order of confinement to the DJJ.

On February 5, 2019, the district attorney filed the fourth petition. This petition alleged one count of criminal threats (Pen. Code, § 422); and one count of vandalism (Pen. Code, § 594, subd. (b)(2)). The petition also alleged the minor should be placed in a more restrictive placement pursuant to section 777, subdivision (a). The petition was amended to allege assault with force likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(4)).

Here, the minor armed himself with a pickaxe and attempted to break into a group home to stab another minor. He was accompanied by an accomplice armed with a

sharpened two-foot wooden rake handle. When refused entry by staff, the minor hit the front door with his pickaxe penetrating the door. Staff disarmed the minor but he continued to walk around the group home with his accomplice banging on the windows, trying to get in, and frightening the residents.

The minor admitted the assault, the vandalism, the probation violation, and that he should be placed in a more restrictive placement. The juvenile court dismissed the remaining charge. The court continued the minor as a ward of the court and granted him probation with a suitable group home placement. He was placed in a residential therapeutic program, in which he was enrolled when he committed his next criminal act.

The fifth petition was filed in Stanislaus County on August 11, 2020, and transferred to Shasta County. This petition alleged one count of robbery (Pen. Code, § 211) and was amended to add a count of assault with force likely to cause bodily injury (Pen. Code, § 245, subd. (a)(4)).

The minor and an accomplice absconded from their residential treatment home. They saw a man and asked him if he had any drugs for sale. When the victim said, " 'No,' " the minor's accomplice responded, " 'Ok, I'm gonna rob you.' " While the accomplice fought with the victim, the minor kicked the victim, grabbed his cellular phone, wallet, and bag and ran off.

The minor admitted the assault.

Over the time covered by these cases, the juvenile court received reports from the probation officer concerning the behavior of the minor while he was in the Shasta County Juvenile Rehabilitation Facility (JRF) and in his group home. The early notes were positive with reports the minor was respectful to staff and peers. As time went on, the minor's behavior became increasingly poor. The minor had issues getting along with other residents, sexually harassed female residents, threatened other residents, and disrespected staff. He fought with and threatened other residents, threw food, was disrespectful to staff, and was found with metal, a shank, and other contraband. He also

4

repeatedly called his father and left hateful and threatening messages. In the few weeks prior to his final disposition hearing, the minor engaged in much better behavior.

In 2021, the Shasta County Juvenile Court held a contested dispositional hearing on the third and fifth petitions. The prosecution presented testimony and documentary evidence of the programs and services available at DJJ. These programs included high school and college courses of study; intake processes to determine the minor's mental health, education, and programming needs; anger management and career and technical education programs; substance abuse programs; and mental health placement and intensive mental health treatment.

The minor presented evidence about a program called Jordan Crossing. This is a faith-based facility that requires its residents to commit for one year and is primarily focused on substance abuse treatment. It also has a component of anger management (through teleclasses with another provider), job skill training, and communications skill training. Unlike DJJ, Jordan Crossing is not a lockdown facility, does not have in-house mental health treatment programs, nor does it have any way to enforce its one-year confinement protocol. More than 50 percent of the residents who start the program never complete it. The minor also presented documentary evidence questioning the efficacy of DJJ.

The minor presented the testimony of a clinical psychologist who interviewed the minor for the disposition hearing. The psychologist agreed the minor needed anger management therapy. He believed the minor's behavioral issues were secondarily, not primarily, influenced by his substance abuse problems. The psychologist was generally aware of DJJ's mental health services and believed they were appropriate for what they provide. He also believed there was a problem in placing the minor at Jordan Crossing because they did not have in-house mental health services. At the same time, he expressed concern DJJ may not be the best option for the minor and believed Jordan Crossing would be more beneficial than incarceration.

5

The prosecution argued the juvenile court should commit the minor to the DJJ and the minor argued for confinement to the Jordan's Crossing program.

Probation originally recommended the DJJ confinement, but after the disposition hearing, it changed its recommendation to state it was not opposed to a grant of probation with a confinement of two years six months to the JRF and discretionary release to a residential treatment facility.

In making its decision, the juvenile court stated it had observed the minor for the three years prior to the disposition hearing and found the minor had demonstrated an "explosive temper." The juvenile court stated when the minor was in the JRF, his behavior was "just atrocious, months of violent and threatening behaviors, hiding materials to make weapons and things of that nature, and then in the last month or so his behavior has improved markably [*sic*], but I can't ignore the prior three years." While the juvenile court was impressed with the programing at Jordan Crossing, the juvenile court found its focus was on substance abuse, not on the minor's primary problems of impulse control, anger issues, and violence. Further, the Jordan Crossing program had the additional drawbacks of not having any way to keep the minor there and more than 50 percent of its residents quit. Thus, the juvenile court concluded the Jordan's Crossing program did not have adequate services to help the minor. The juvenile court also considered further detention in the JRF, but found the JRF did not have the resources DJJ has and the potential time of confinement was not long enough. As a result, the juvenile court committed the minor to the DJJ and set the maximum term of confinement for the sustained petitions at nine years.

The juvenile court calculated the maximum term of confinement by taking the upper term of the assault on a peace officer count of five years, and adding one-year consecutive terms (one-third the middle term) for the two other assault counts, eight months (one-third the middle term) for a "felony" vandalism count (which the minor admitted as a misdemeanor), and four months each (one-third the maximum term) for the

6

remaining two misdemeanor vandalism counts and the two misdemeanor resisting, obstructing, or delaying a peace officer in the performance of his or her duties counts. The minor timely appealed.

DISCUSSION

The minor contends the trial court erred in committing him to DJJ and erred in setting the maximum term of confinement. The Attorney General concedes the maximum term of confinement is wrongly calculated.

*A. Confinement to DJJ*

The minor argues the trial court abused its discretion in committing him to DJJ because there was no substantial evidence a less restrictive option would be ineffective or inappropriate. We disagree.

Minors under the juvenile court's jurisdiction must receive "care, treatment, and guidance consistent with their best interest and the best interest of the public." (§ 202, subd. (b).) "Under section 202, juvenile proceedings are primarily 'rehabilitative' (*id.*, subd. (b)), and punishment in the form of 'retribution' is disallowed (*id.*, subd. (e)). Within these bounds, the court has broad discretion to choose probation and/or various forms of custodial confinement in order to hold juveniles accountable for their behavior, and to protect the public. (*Id.*, subd. (e).)" (*In re Eddie M.* (2003) 31 Cal.4th 480, 507.)

"We review the [juvenile] court's placement decision for an abuse of discretion. [Citation.] We review the court's findings for substantial evidence, and ' "[a] trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence." ' " (*In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1154.) In making this determination, we indulge in "all reasonable inferences to support the juvenile court's decision. [Citations.] Nonetheless, there must be evidence in the record demonstrating both a probable benefit to the minor by a [DJJ] commitment and the inappropriateness or ineffectiveness of less restrictive alternatives. [Citations.]" (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396.) A juvenile court does not "necessarily abuse its discretion

7

by ordering the most restrictive placement before other options have been tried. [Citations.]" (*In re Eddie M.*, *supra*, 31 Cal.4th at p. 507.)

Substantial evidence supports the juvenile court's finding the DJJ commitment offered the minor a probable benefit. Consistent with *In re Carlos J.* (2018) 22 Cal.App.5th 1, 10, the juvenile court received evidence of the programs and services available to this minor before ordering his placement in that facility. Further, the juvenile court understood the needs of this minor based on the evidence and the five petitions it had adjudicated over the prior three years. The evidence demonstrated the DJJ commitment offered in-house mental health placement and services that addressed his needs. The DJJ placement further offered a broad range of in-house services and programs for the minor: high school and college education, career and technical education programs, anger management, and substance abuse programs. Contrasted with the DJJ commitment, the Jordan Crossing program only offered mental health therapy through its community and county partners. Its focus on substance abuse recovery did not address the minor's major issues centered on anger and violence.

Further, the record demonstrates the juvenile court considered less restrictive alternatives and found them ineffective or inappropriate. Substantial evidence supports this determination. The Jordan Crossing program was inappropriate because it was not a lockdown facility nor did the program have the ability to enforce its one-year commitment to keep its residents. The minor demonstrated a penchant to leave his placement and commit crimes. In the fourth petition, he was in a group home when he tried to attack another resident of the group home with a pickaxe. In the fifth petition, the minor was in a group home and left that placement to commit the assault. Jordan Crossing did not have in-house mental care facilities which was a problem as admitted by the minor's own witness. The anger management courses were only available by teleclasses through another outside provider.

8

Further, the record supports the finding these less restrictive alternatives, particularly his JRF placements, were ineffective as evidenced by the reports of the minor's repeated rules violations, bouts of anger, violence, and lack of impulse control. The record included repeated reports the minor violated the rules on contraband and weapons, and engaged in repeated instances of disrespectful, violent, and harassing interactions with staff and other residents, while at the JRF. Further, any commitment to JRF lacked the length of the term of confinement the court believed was appropriate for this minor. As conceded by the minor, at the time of his disposition the juvenile hall commitment was limited to three years. (§ 607, subd. (a).) Based on this record, the juvenile court did not abuse its discretion to find these less restrictive alternatives were not appropriate.

Substantial evidence also supports the trial court's finding the less restrictive alternatives were not effective for this minor due to his extended pattern of misbehavior while in these placements. The minor's criminal record stretches through five petitions over a period of three years while he was placed in less restrictive alternatives. Every time the court granted him probation, he violated it. While he was in these less restrictive alternatives, his offenses escalated, from stealing, and kicking and spitting in the interior of a police car, to pulling a knife on a probation officer, to pounding a door with a pickaxe as part of his attempt to hurt a resident, and ultimately to an assault as part of a robbery. This progression of violence demonstrates the juvenile court's repeated attempts to use less restrictive alternatives were ineffective.

The minor argues the improvement of his behavior in the several weeks prior to his final disposition hearing is material and further argues no substantial evidence shows this change in behavior was illusory, unsustainable, or false. We conclude the juvenile court did not abuse its discretion in finding the recent six-week turnaround of his misbehavior was insufficient to overcome the persuasive weight of his prior years of misbehavior chronicled by this case.

9

The minor argues *In re Miguel C.* (2021) 69 Cal.App.5th 899 compels us to reverse his commitment to DJJ. We disagree. In that case, the minor presented evidence of his prior unblemished record and the single violent crime brought about by his substance abuse that was before the juvenile court. (*Id.* at p. 904.) He also presented evidence that commitment to a higher level security environment like the DJJ might put his rehabilitative chances at risk by exposing him to a culture filled with drugs, violence, and a social structure revolving around gang affiliation. (*Id* at p. 905.) In contrast, the prosecution presented no witnesses and relied solely on the probation report concluding the minor was at high risk for recidivism. (*Ibid.*) In reversing this commitment, the appellate court concluded, "where a minor presents evidence suggesting that a DJJ placement would be harmful for reasons specific to the minor, the [prosecution] must provide some contrary evidence that would enable the juvenile court to make a comparative analysis of the placement options before it concludes the minor will probably benefit from DJJ, and that less restrictive options would be ineffective or inappropriate." (*Id.* at p. 902, italics omitted.)

Here, this minor did not come to the juvenile court as a minor with a single incident on an otherwise untarnished record. This disposition hearing was on his fifth petition in three years of increasingly violent behavior with three years of documented bad behavior while he was in detention. He did not present evidence the DJJ placement would be harmful for any reasons specific to him. And the prosecution presented evidence of the programs and services available to him at DJJ.

The minor's final argument is the juvenile court failed to consider the Legislative intent underlying Senate Bill No. 823 (2019-2020 Reg. Sess.) (Stats. 2020, ch. 337), which will ultimately close DJJ and transfer minors back to local facilities. At the disposition hearing, the trial court heard testimony DJJ would stop taking new wards as of July 1, 2021, under this law. At the time of this hearing in March 2021, however, DJJ was not closed. For those wards properly admitted, the court heard evidence that DJJ

10

would provide ongoing treatment and mental health services for wards for the full term of their commitment.

We conclude the juvenile court's determination the DJJ placement was appropriate for this minor was not an abuse of discretion.

*B. Maximum Term of Confinement*

The minor argues the trial court improperly used the upper term of five years on the assault on a peace officer to set the maximum term of confinement instead of four years and mistakenly treated one of the vandalism counts as a felony. The Attorney General properly concedes both points. We agree.

Section 731, subdivision (b) provides the juvenile court "shall not commit a ward to the Division of Juvenile Justice for a period that exceeds the middle term of imprisonment that could be imposed upon an adult convicted of the same offense."

Here, the juvenile court selected the upper term of five years for the assault on a peace officer instead of the middle term of four years in setting the maximum term of confinement. That provision carries with it the sentencing triad of three, four, or five years. (Pen. Code, § 245, subd. (c).) We will order the maximum term of confinement reduced by one year to four years.

Further, when determining the total time of confinement, the juvenile court must add one-third of the one-year term for subordinate misdemeanor counts to the principal term. (*In re Deborah C*. (1981) 30 Cal.3d 125, 140.) The juvenile court mistakenly found the defendant's admission to one of the misdemeanor vandalism counts was as a felony and added eight months instead of four. This was error and we will order it corrected.

## DISPOSITION

The judgment is modified to reflect a maximum confinement time of seven years eight months. As modified, the judgment is affirmed. The juvenile court is directed to prepare an amended DJJ commitment order consistent with the modified judgment, to

11

forward the amended order to the appropriate authorities, and to amend other court records as necessary to reflect the modified judgment.

/s/
HOCH, J.

We concur:

/s/
MAURO, Acting P. J.

/s/
RENNER, J.