Filed 12/4/15  In re E.A. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re E.A., a Person Coming Under the Juvenile Court Law. | B260428<br><br>(Los Angeles County<br>Super. Ct. No. GJ29260) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>E.A.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Robin Miller Sloan, Judge. Affirmed in part and remanded with instructions.

Gerald Peters, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews, Analee J. Brodie and Michael Keller, Deputy Attorneys General, for Plaintiff and Respondent.

E.A., a minor, appeals from an order adjudicating him a ward of the juvenile court under Welfare and Institutions Code section 602. E.A. contends there was insufficient evidence to support the juvenile court's finding that he made or aided and abetted the making of criminal threats (Pen. Code, § 422, subd. (a))[1] against victim Vanessa C. He further contends that the court erred by miscalculating the maximum term of confinement to which he was subject and by failing to aggregate his predisposition custody credits. Respondent concedes the latter error.

We remand for modification of the adjudication order and abstract of judgment to reflect the correct number of predisposition custody credits. We otherwise affirm the judgment of the juvenile court.

## PROCEDURAL HISTORY

In a Welfare and Institutions Code section 602 petition filed on August 14, 2014, appellant was charged with making criminal threats against Vanessa C. in violation of section 422, subdivision (a). The petition further alleged appellant personally used a deadly and dangerous weapon, a metal pipe, elevating the offense to a serious felony within the meaning of section 1192.7, subdivision (c)(23). (§ 12022, subd. (b).) After a two-day contested adjudication hearing, the juvenile court found true the criminal threats allegation but not the enhancement pertaining to the metal pipe.

The juvenile court sustained the petition and declared the offense a felony. The court declared appellant a ward of the court and ordered him placed in a six-month camp community placement program, with a maximum term of physical confinement of six years, 10 months (82 months). The court awarded appellant 52 days of predisposition custody credit. Appellant timely appealed.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

# FACTUAL BACKGROUND

## A.    *The Prosecution Case*

On August 9, 2014, at approximately 9:30 p.m., 17-year-old Vanessa C. was inside her second-story Alhambra apartment with her parents and two brothers, Brian and Michael. Vanessa was in her bedroom when she heard "a bunch of cars and people outside of [her] house yelling and cursing." She looked out the window and saw approximately 10 to 15 young men, whom she estimated to be between the ages of 17 and 20. The males were in a group together, and most of them were armed with bats. She did not see appellant among the males.

Vanessa recognized two of the males as appellant's codefendants, Frank S. and Christopher T. Frank was holding a small metal bat. She saw Frank and Christopher looking into the open living room window and heard one of say, "Fuck you. You know who we are here for." She also heard "a bunch of voices" saying things like "F you, you know who we're here for" and "We are going to get you." The males surrounded the apartment ground floor.

Afraid, Vanessa locked the front door and armed herself with a knife from the kitchen. Vanessa yelled to the males that they better leave because she was going to call the police. The males responded, "Fuck you." Vanessa called the police, but the males ran away before officers arrived on the scene within 10 minutes of the call. The police stayed at the scene for approximately 20-30 minutes.

Vanessa could not sleep because she was scared and afraid the males would come back. Around midnight, she heard noises outside. She looked out her bedroom window and saw that the group of males had returned. This time, she saw appellant along with Frank and Christopher. Vanessa did not recognize anyone else in the group of 15 to 20 males.

The males were "trying to be kind of quiet," but Vanessa could hear them through her open window. She heard and saw five or six of them, including Frank and Christopher, run up the exterior stairs. Frank was carrying a small black gun, and

3

Christopher banged what sounded like a metal object and might have been a gun on the stair railing. Appellant remained downstairs and did not say anything. Vanessa testified that she did not see anything in his hands, but was "not so sure" about that.

Vanessa told her parents that the males had returned. Her parents seemed worried and barricaded the front door with a couch.

Vanessa heard the five or six males outside the front door yelling. They banged on the door for about three to four minutes, during which time there was "a bunch of yelling," including "F. U., F. U. We are going to get you guys," "You know who we are here for," and "F.U. guys." Vanessa also heard one of the males tell her neighbor, "Shut the fuck up, bitch. I am going to kill you." Vanessa did not know who the males were there for and did not think they were there for her because she "didn't have any problems with them." She nonetheless felt more threatened and scared than she had earlier that evening, because she knew the males were armed with a gun and thought they were going to enter the apartment and "probably will kill" her.

Vanessa called the police. Once again the group of males dispersed, running in all directions before the police arrived. Shortly after the males left, Vanessa heard three gunshots in the alley behind the apartment. The police did not find any evidence of gunshots when they searched there.

Officer Eric Ybarra of the Alhambra Police Department interviewed Vanessa when he arrived at the apartment building. According to Officer Ybarra, Vanessa was "scared" and "shaken up" but was able to answer his questions. Vanessa identified appellant, Frank, and Christopher by name. She told Officer Ybarra that appellant was holding an unknown weapon, Frank had a handgun, and Christopher had a bat or wooden stick.

Officer Ybarra also spoke with Vanessa's downstairs neighbor, Breanna Galindo. According to Officer Ybarra, Galindo reported seeing and hearing people yelling outside of her apartment window. Galindo told Officer Ybarra that the people were the same ones who had been outside earlier in the evening. According to Officer Ybarra, Galindo

4

told him one of the males was holding a small handgun and yelling for Brian to come out of the apartment. According to Galindo, she told Officer Ybarra only that she heard "guys outside yelling"; she could not remember what the males were yelling and did not remember telling police officers what the males were yelling. Galindo also testified that a family member of one of the defendants threatened her before she took the stand.

Another responding officer, Andrea Fuentes, interviewed Vanessa's father, Hector G. Officer Fuentes testified that Hector "seemed frightened." According to Officer Fuentes's report documenting the interview, Hector said that he heard pounding on his front door and saw four to five males outside. One of them yelled, "Fuck you, way, we are going to get you." According to Officer Fuentes, Hector told her that one of the males had a gun and that he moved a couch in front of the door because he feared the male with the gun would get inside. Hector testified that he did not remember telling an officer that he saw someone with a gun or heard someone say "Fuck you, way, we are going to get you."

Two days after the incidents, police officers showed Vanessa three "six pack" photo arrays. Vanessa identified appellant, Frank, and Christopher. Vanessa wrote on the photo array containing appellant that he "was holding a metal pipe." At the adjudication, however, Vanessa testified that she did not see anything in appellant's hands. Vanessa also testified that although she wrote on the photo arrays that Christopher had a gun and Frank had a bat, at the time of her testimony she was "99 percent sure" it was Frank who had the gun. Vanessa explained that she "got nervous" while talking to the police and remembered more clearly after she "calmed down."

## B.    *The Defense Case*

Appellant's parents both testified on his behalf. His father, E.A., Sr., testified that he was at home with his wife, appellant, and appellant's sister on the evening of August 9, 2014. When E.A., Sr. went to sleep around 9:30 or 10:00 p.m., appellant was home. E.A., Sr. has two dogs that bark whenever someone enters or leaves the family's home.

5

E.A., Sr. did not hear the dogs bark that night. When he woke up in the morning between 6:00 and 7:00 a.m., appellant was at home, asleep.

E.A.'s mother, Blanca F., went to sleep at 10:30 or 11:00 p.m. on the night of August 9, 2014 and was asleep at midnight. Appellant was home when she went to bed.

## DISCUSSION

**I.      There is sufficient evidence to support the juvenile court's finding.**

### A.      *Standard of Review*

The standard of review of the sufficiency of the evidence in delinquency cases is the same as in criminal cases. (*In re Matthew A.* (2008) 165 Cal.App.4th 537, 540). We review the record in the light most favorable to the judgment to determine whether substantial evidence supports the conviction. (*Ibid.*) Substantial evidence is "evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) Reversal for lack of substantial evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We do not resolve issues of witness credibility or conflicts in the evidence, as those determinations lie within the exclusive province of the trier of fact. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Ibid.*)

### B.      *Substantial evidence supports the juvenile court's finding that threats were directed at Vanessa C.*

The juvenile court found true the allegation that appellant made criminal threats against Vanessa C. in violation of section 422, subdivision (a). Appellant first contends the juvenile court's finding cannot stand because there is no evidence that any threats made by anyone in the group were directed at Vanessa or that Vanessa believed the threats were directed at her. We reject this contention.

6

Section 422, subdivision (a) provides: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

This statutory language can be divided into five elements the prosecution must prove: "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in the death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228; see also *People v. Lipsett* (2014) 223 Cal.App.4th 1060, 1064.)

Appellant is correct in the limited sense that none of the threats made during either of the two incidents specifically identified Vanessa C. by name. However, whether a person's name was used is not a relevant consideration when determining whether a criminal threat was made. (*People v. Lipsett*, *supra*, 223 Cal.App.4th at p. 1065.) "By its

7

plain language, section 422 contains no exception for threats that are technically addressed to third parties. Instead, it requires that a defendant intend 'the statement . . . to be taken as a threat' by the victim. (§ 422, subd. (a).) A defendant may harbor such intent even while grammatically addressing the threat to someone other than the victim." (*Ibid.*) The real question is whether the defendant intended the victim identified in the charging documents to take the statement as a threat, not whether the threat was syntactically addressed to the victim. (*Ibid.*)

Here, the threats made during the midnight incident at which appellant was present included "F.U., F.U. We are going to get you guys," and "F.U. guys." The colloquial phrase "you guys" is an inclusive one that the trier of fact reasonably could have found to include Vanessa. Indeed, Vanessa testified that she believed Frank S. "threatened her whole family" by yelling the vague statements he did. Officer Ybarra also testified that Vanessa remained in sustained fear – "scared" and "shaken up"– even after the males left.

More importantly, the actions of the persons making the threats reasonably support the inference that they intended their words to be taken as threats by everyone in the apartment. The males returned to the apartment, in larger numbers, in the dead of night, after Vanessa previously called the police. Some of them were armed with deadly weapons. They surrounded the apartment and banged on the family's door for three to four minutes, prompting Vanessa's parents to barricade the door with the family's sofa. They neglected to identify a specific target, instead using the inclusive language "you guys." All of these facts reasonably support the juvenile court's conclusion that Vanessa was an intended victim of the threats.

C. ***Substantial evidence supports the juvenile court's finding that appellant aided and abetted the direct perpetrators.***

Appellant also contends that there is insufficient evidence that he aided and abetted the making of criminal threats. He argues that he did not say or do anything

8

during the incident, and that there is no evidence against him "other than his presence outside" Vanessa's apartment. We are not persuaded.

A person may commit the crime of making criminal threats either directly or as an aider and abettor. (See § 31.) Here, there is no dispute that appellant was not a direct perpetrator in that he did not speak any threats. His liability therefore turns on whether the evidence supports the juvenile court's conclusion that he aided and abetted the males who personally made the criminal threats. "'A "person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."' [Citation.]" (*People v. Lam Thanh Nguyen* (2015) 61 Cal.4th 1015, 1054.)

The test of whether a person aided or abetted in the commission of an offense is "whether the accused in any way, directly or indirectly, aided the perpetrator by acts or encouraged him by words or gestures." (*People v. Villa* (1957) 156 Cal.App.2d 128, 134.) Factors that may be taken into account when determining whether a defendant was an aider and abettor include presence at the crime scene, companionship, and conduct before and after the offense, including flight. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409; *In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094-1095.) Mere presence at the scene of a crime, knowledge of the perpetrator's criminal purpose, or the failure to prevent the crime do not alone amount to aiding and abetting, although these factors also may be taken into account in determining criminal responsibility. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 272-273.) Ultimately, "'[w]hether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment.' [Citation.]" (*People v. Campbell*, *supra*, 25 Cal.App.4th at p. 409.)

Substantial evidence supported the juvenile court's finding that appellant aided and abetted his codefendants' criminal threats. Appellant was present when the threats

were made.  He was part of a large group of similarly aged males that surrounded Vanessa's apartment late at night, for a second time in a single evening.  Some members of the groups were visibly armed.  Although appellant did not run up the stairs with the active perpetrators, he stood sentry at the bottom; a trier of fact reasonably could infer that in doing so, he encouraged or assisted his confederates by controlling access to and from the target apartment.  Appellant also fled the scene contemporaneously with the other males, a fact further suggestive of more extensive involvement in the incident than "mere presence."  This evidence, taken in the light most favorable to the judgment, demonstrates that appellant was working together with his codefendants and other members of the group to carry out the crime of making criminal threats.

**II.      The juvenile court correctly computed the maximum term of confinement.**

Appellant contends that the juvenile court erred in calculating his maximum term of confinement to be six years, 10 months (82 months).  He argues that the maximum term of confinement should have been four years, six months (54 months).  We conclude that the juvenile court correctly calculated appellant's maximum term of confinement.

The version of Welfare and Institutions Code section 726, subdivision (d) in effect at the time of appellant's adjudication required a juvenile court that removed a minor from the physical custody of his or her parents or guardians to "specify that the minor may not be held in physical confinement for a period in excess of the maximum term of imprisonment which could be imposed upon an adult convicted of the offense or offenses which brought or continued the minor under the jurisdiction of the juvenile court."[2]  For purposes of Welfare and Institutions Code section 726, "'maximum term of imprisonment' means the longest of the three time periods set forth in paragraph (2) of subdivision (a) of Section 1170 of the Penal Code, but without the need to follow the provisions of subdivision (b) of Section 1170 of the Penal Code or to consider time for

[2] The current version of Welfare and Institutions Code section 726, effective January 1, 2015, is substantively identical to the version in effect at the time of appellant's adjudication.  The primary difference between the former and current versions of the statute is that the current version breaks subdivision (d) into six subdivisions.

10

good behavior or participation pursuant to Sections 2930, 2931, and 2932 of the Penal Code, plus enhancements which must be proven if pled." (Former Welf. & Inst. Code, § 726, subd. (d) [substantially similar to current Welf. & Inst. Code, § 726, subd. (d)(2)].) "If the court elects to aggregate the period of physical confinement on multiple counts or multiple petitions, including previously sustained petitions adjudging the minor a ward within [Welfare and Institutions Code] Section 602, the 'maximum term of imprisonment' shall be the aggregate term of imprisonment specified in subdivision (a) of Section 1170.1 of the Penal Code, which includes any additional term imposed pursuant to Section 667, 667.5, 667.6, or 12022.1 of the Penal Code, and Section 11370.2 of the Health and Safety Code." (Former Welf. & Inst. Code, § 726, subd. (d) [substantially similar to current Welf. & Inst. Code, § 726, subd. (d)(3)].) The aggregate term of imprisonment specified in section 1170.1, subdivision (a) is "the sum of the principal term, the subordinate term, and any additional term imposed for applicable enhancements for prior convictions, prior prison terms, and Section 12022.1." (§ 1170.1, subd. (a).) "The principal term shall consist of the greatest term of imprisonment imposed by the court for any of the crimes," while the subordinate term for each consecutive offense consists of "one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed." (*Ibid.*) The aggregation provisions of section 1170.1 are applied whether the offenses committed by the minor are felonies or misdemeanors. (*In re Eric J.* (1979) 25 Cal.3d 522, 537; see also *In re Deborah C.* (1981) 30 Cal.3d 125, 140.)

The instant Welfare and Institutions Code section 602 petition was the third such petition filed against appellant in a span of approximately two years. The first petition, filed on June 5, 2012, alleged appellant committed the offense of first degree burglary (§ 459). Upon appellant's admission of the offense, the juvenile court sustained the petition, declared the offense a felony, and set appellant's maximum term of confinement at six years (72 months), the high term for the offense (see § 461, subd. (a)). The second petition, filed on April 17, 2014, alleged appellant committed misdemeanor battery

11

(§§ 242, 243, subd. (a)). Appellant admitted the allegations, and the juvenile court sustained the petition. The juvenile court did not set a maximum term of confinement, which was appropriate in light of the court's decision to leave in place appellant's previous order of home on probation. (See *In re A.C.* (2014) 224 Cal.App.4th 590, 591-592.)[3] The sole prescribed term for misdemeanor battery is six months. (§ 243, subd. (a).)

In connection with the current petition, the juvenile court found true the allegation of criminal threats (§ 422, subd. (a)), a charge that carries a low term of 16 months, a midterm of two years, and a high term of three years in state prison. The court elected to aggregate the terms and did so in accordance with the strictures of Welfare and Institutions Code section 726, subdivision (d). The principal term here was the six-year high term associated with the burglary allegation sustained in the first petition. The court correctly added to that two subordinate terms for the misdemeanor battery (two months, or one-third the term of six months) and the instant felony criminal threats (eight months, or one-third the midterm of two years), for a total of six years, ten months (82 months). The court's end result was the correct one.

Appellant appears to contend that the court should have used the three-year maximum term for criminal threats as the "principal term," and then added to that one-third the four-year midterm for first degree burglary (16 months) and one-third the six-month term for misdemeanor battery (two months), for a total of four years, six months (54 months: 36 + 16 + 2). However, the principal term consists not of the present crime but rather "the greatest term of imprisonment imposed by the court for any of the crimes." (§ 1170.1, subd. (a).) Thus, the court, having elected to aggregate the terms, was required to pick "'the longest' term, not 'the most appropriate' term" as the starting

---

[3] Although the court should not have set a maximum term of confinement for the first petition, as appellant was not removed from the custody of his parents, there is no indication that appellant challenged the error at that time.

point for the calculation. (*In re Eddie L.* (2009) 175 Cal.App.4th 809, 814.) The court did not err in doing so.

**III.    The juvenile court erred in failing to aggregate predisposition credits.**

Appellant's final contention is that the juvenile court erred by failing to aggregate his predisposition credits. He argues that he should have received a total of 97 days of credit, computed by adding together the 18 days of credit he was awarded in connection with the first petition, the 27 days of credit he was awarded in connection with the second petition, and the 52 days of credit he was awarded in connection with the third. Respondent concedes the juvenile court should have aggregated appellant's predisposition credits, but argues that appellant is entitled only to a total of 79 days of credit. We agree with appellant and remand for modification of the adjudication order and abstract of judgment to reflect the correct number of predisposition custody credits, 97 days.

In a juvenile delinquency proceeding, "a minor is entitled to credit against his or her maximum term of confinement for the time spent in custody before the disposition hearing." (*In re Emilio C.* (2004) 116 Cal.App.4th 1058, 1067, citing § 2900.5, subd. (a) and *In re Eric J.*, *supra*, 25 Cal.3d at pp. 533-536.) "It is the juvenile court's duty to calculate the number of days earned, and the court may not delegate that duty." (*In re Emilio C., supra,* at p. 1067.) A juvenile court which elects to aggregate a minor's period of physical confinement also must aggregate the predisposition custody credits attributable to those multiple petitions. (*In re A.M.* (2014) 225 Cal.App.4th 1075, 1085-1086.)

The parties agree that the juvenile court did not aggregate appellant's predisposition credits. The record reflects this fact. Although the juvenile court acknowledged during the disposition hearing that appellant had "prior credit" that would be calculated "at some point," the court's adjudication and disposition order awards predisposition credit of 52 days, for "this petition only." This was error.

13

The parties dispute the magnitude of the error. Appellant contends that a total of 45 days of predisposition custody credit should be added to the 52 already awarded, to reflect the 18 days of predisposition custody credit he received in connection with his first petition and the 27 days of predisposition custody credit he was awarded in connection with his second petition. Respondent contends that the 27 days of predisposition custody credit awarded in connection with the second petition already accounted for the 18 days of predisposition credit appellant received with the first petition. That is, respondent argues that "[t]he trial court was required to aggregate appellant's predisposition credits following the second petition, and nothing in the record indicates it failed to do so," and urges us to correct the award by adding only 27 days to the 52 already awarded.

We may calculate the correct amount of credit ourselves if there is sufficient information in the record from which to do. (See *In re Emilio C.*, *supra*, 116 Cal.App.4th at p. 1068; *In re Antwon R.* (2001) 87 Cal.App.4th 348, 353.) The record here contains sufficient information for us to make the calculation: the amount of predisposition custody credit appellant previously received is in the record and is undisputed. We agree with appellant that he is entitled to receive an additional 45 days of predisposition credit.

Respondent has cited no authority in support of its contention that the juvenile court "was required to aggregate appellant's predisposition credits following the second petition," and we have not located any. Although the juvenile court is required to aggregate predisposition custody credits when it elects to aggregate a minor's maximum period of confinement (*In re A.M.*, *supra*, 225 Cal.App.4th at pp. 1085-1086), the court adjudicating appellant's second petition did not aggregate his maximum period of confinement and could not do so since it did not remove him from his parents' custody (see *In re A.C.*, *supra*, 224 Cal.App.4th at pp. 591-592). Indeed, respondent recognized in its brief that "[n]o maximum period of confinement was set after the second petition was sustained," and accurately noted the juvenile court was correct not to specify a maximum period of confinement. Even if the juvenile court had removed appellant from

14

his parents in connection with the second petition, former Welfare and Institutions Code section 726, subdivision (d) would have vested in the court discretion over whether to aggregate the period of physical confinement on multiple counts or multiple petitions when calculating appellant's maximum term of confinement. Only if the court had exercised that discretion in favor of aggregating the maximum term of confinement would it have been required to aggregate the predisposition credits as respondent suggests.

The bottom line is that the juvenile court that resolved the second petition did not aggregate the maximum period of confinement for the first and second petitions – and accordingly had no basis to aggregate appellant's predisposition custody credits associated with those two petitions. We therefore reject respondent's contention that the award of 27 days of predisposition custody credits necessarily included the previous 18 days of predisposition custody credits appellant had been awarded. The juvenile court that adjudicated appellant's third petition elected to aggregate his maximum term of confinement by adding together all three petitions, and by doing so triggered a concomitant obligation to aggregate all of the predisposition credits attributable to those petitions. Appellant is entitled to 97 days of predisposition custody credits.

## DISPOSITION

We remand for modification of the adjudication order and abstract of judgment to reflect the correct number of predisposition custody credits, 97 days. We otherwise affirm the judgment of the juvenile court.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


WILLHITE, Acting P. J.                                    MANELLA, J.

15