Filed 6/6/25  P. v. Yax CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E081593 |
| v. | (Super.Ct.No. SWF2101631) |
| SELVIN EXEQUIEL GARCIA YAX, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  James S. Hawkins, Judge.  Affirmed.

Laura P. Gordon, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Donald W. Ostertag and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Selvin Exequiel Garcia Yax of committing numerous sexual offenses against his two minor stepdaughters. On appeal, Yax argues that the trial court prejudicially erred by admitting statements that he made to a county social worker while he was in custody, because she interviewed him after he invoked his right to counsel. Yax also challenges the sufficiency of the evidence concerning the asportation and increased risk elements of an aggravated kidnapping count and the duress element of 11 other offenses. In addition, Yax contends that the trial court erred by concluding that he is not entitled to presentence conduct credits. We affirm.

BACKGROUND

I.      *Family background*

Alba Aguilar has two daughters—Jane Doe 1 (born in August 2004) and Jane Doe 2 (born in June 2006). Aguilar was married to Yax for 14 years. Yax was born in 1976. Aguilar met Yax when Doe 1 was almost 4 years old and Doe 2 was almost two years old. Both Doe 1 and Doe 2 called Yax "'Dad.'"

In 2011, the family moved into a two-bedroom apartment, which Doe 1 described as "pretty small." Initially, Doe 1 and Doe 2 slept in the master bedroom along with Yax and Aguilar. When Doe 1 was in the eighth grade, the girls moved into the bedroom across the hall. The girls' separate bedroom did not have a doorknob.

When Doe 1 was 18 years old, she was 4 feet 11 inches tall and weighed 120 pounds. When Doe 2 was 16 years old, she was 4 feet 11 inches tall and weighed 100 pounds. Both girls described Yax as taller and stronger than they were. Doe 1 described

2

Yax as "[s]lightly overweight" and "very strong, like muscular a little bit." A law enforcement officer described Yax as having a stocky build with a larger stomach.

II.    *The charges*

In 2022, the People charged Yax by information with committing one count of kidnapping Doe 2 to commit rape (Pen. Code, § 209, subd. (b)(1)) and a total of 30 sexual offenses against Doe 1 and Doe 2, with 26 offenses alleged to have been committed against Doe 1 between seven and 17 years old and five offenses alleged to have been committed against Doe 2 when she was between 14 and 15 years old, including multiple counts of (1) sexual intercourse or sodomy and of oral copulation or sexual penetration with a child 10 years old or younger (Pen. Code, § 288.7, subds. (a)-(b)); (2) rape, oral copulation, sodomy of and lewd and lascivious conduct with a child under 14 years old (Pen. Code, §§ 269, subd. (a)(1), (3) (4), 288, subd. (b)(1)); and (3) forcible rape and oral copulation of a minor aged 14 years or older (Pen. Code, § 264, subd. (c)(2) & (c)(2)(C)). (Unlabeled statutory references are to the Penal Code.) Fifteen of the offenses were alleged to have been committed by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury. (§§ 269, subd. (a)(3)-(4), 264, subd. (c)(2).) Eighteen of the offenses contained a special allegation that Yax committed a qualifying sex offense against multiple victims under the one strike law. (§ 667.61, subd. (e)(4).)

III.    *Testimony of Doe 1 and Doe 2*

Both Doe 1 and Doe 2 testified at trial in 2023, when Doe 1 was 18 years old and Doe 2 was 16 years old.

A.    *Doe 1*

Yax first touched Doe 1 inappropriately when the family lived in the two-bedroom apartment and Doe 1 was a six-year-old attending first grade. Doe 1 could not recall when Yax first touched her in a way that she did not like. She testified, "From my oldest memory, I remember he was already doing intercourse—sexual intercourse," by which she meant Yax putting his penis in her vagina. The first incident of sexual intercourse that she could remember took place when she was in first grade. It happened after she took a shower in the bathroom attached to the primary bedroom. Doe 1 was naked, and Yax called her to him, briefly touched her, laid her down on the bed, and "inserted himself in [her]." Yax thereafter had sexual intercourse with her about three times per month, in either his bedroom, his bathroom, or the living room. When Doe 1 was 15 years old, Yax started having sexual intercourse with her every day.

Doe 1 testified extensively about other sexual acts that Yax performed with her, including digital penetration, oral copulation, and sodomy. Starting when she was in the first grade, Yax inserted his fingers into Doe 1's vagina "almost every time that he would do something." Yax put his penis inside of Doe 1's mouth "a few times." She recalled two such incidents that occurred when she was in elementary school, and she said that it happened "maybe" three times while she was in middle school. Yax also sometimes

4

licked her vagina, once or twice when Doe 1 was in middle school and more frequently the summer before she entered high school and during her freshman year of high school, when he did it nearly every time that he had sexual intercourse with her. Starting when she was in middle school, Yax put his penis inside of Doe 1's anus. The first time caused Doe 1 to bleed, and she cried a lot because it "hurt so much." Yax put his penis inside her anus inconsistently thereafter because Doe 1 said that it hurt and that she did not want him to do it. With respect to putting his penis inside Doe 1's anus, Yax would sometimes "back off, but sometimes he would still insist" and "just go all the way, like put it in." Doe 1 made noises indicating that she was in pain when he did it, and she also told him to stop. When Doe 1 told him to stop, Yax "would just say that 'It's okay,' like to 'Hold it in,' that 'It will be quick.'"

Yax sometimes covered Doe 1's face when he was sexually abusing her. Doe 1 believed that Yax covered her face when it looked like she "wasn't enjoying it" or when he was recording the abuse. Doe 1 once removed the object that was covering her face and saw a phone facing toward Yax, and she realized that he was recording the abuse.

Doe 1 did not want Yax to sexually abuse her. Doe 1 could not recall ever being afraid of Yax. Doe 1 testified that she could not recall ever telling him "'No'" or "'Stop'" when Yax put his penis inside her vagina. Doe 1 did not believe that she was "allowed to say, 'No.'" Doe 1 believed that she had to do whatever Yax asked her to do. Doe 1 confirmed that she told the forensic interviewer that she "would try to stop it, but he would overpower [her]." When Doe 1 was in first and second grade, Yax bought her

5

clothes or snacks right after he sexually abused her. Yax instructed Doe 1 not to tell her mother what he did; she could not recall exactly how he worded the admonition.

Yax got mad if Doe 1 hesitated in doing something sexual with him. Yax sometimes "use[d] his body to hold [her]"— "he would pull [her] legs down" and "pin [her] down." Yax held Doe 1 down when he "was trying to have sexual intercourse with [her]. It would be like when [she] would put up a fight because there would be times when [she] didn't want to at all." Doe 1 "[r]arely" "put up a fight." Doe 1 once hit Yax, and he "overreacted" by crying so Doe 1 "felt bad." Doe 1 explained that Yax would "get so mad at [her], and [she] was so scared of getting him upset because he'd always make [her] look like [she] was the bad person, and [she]'d feel bad."

When Doe 1 was 12 years old and in the sixth grade, she told a schoolmate about the sexual abuse, which led to a law enforcement and dependency investigation. Doe 1 told a law enforcement officer and a social worker about the sexual abuse. Yax did not live with Doe 1's family for a little while after the disclosure. During that period, Aguilar took Doe 1 to a park to meet with Yax. Yax convinced Doe 1 to recant, telling her that he would not be able to support his other children if he went to jail. Doe 1 subsequently recanted the allegations. Yax moved back into the home and told Doe 1 that he would never sexually abuse her again, but the abuse stopped for only one to three months. When he started sexually abusing her again, Doe 1 stopped fighting him, "just let it happen," and accepted what she believed to be her "fate" and "how it was going to be

6

forever." Doe 1 never told Aguilar about the subsequent abuse, because her mother had not believed the earlier disclosure.

When Doe 1 was in eighth grade, Yax installed security cameras inside and outside the residence: Two cameras faced outside over the front door, one was in the kitchen, one was in the master bedroom, and one was above the master bedroom door pointed toward the hallway and the laundry room. The live feed from the surveillance cameras could be displayed on a television in Yax's bedroom. Whenever Yax sexually abused Doe 1 in the master bedroom after the cameras were installed, Yax locked the bedroom door and had the live feed from the security cameras on the television. Yax also could view the security camera live feed on an application on his cell phone. If Yax saw Doe 1's mother headed to the bedroom, then he would "freak out" and tell Doe 1 to get dressed, which she would do. Doe 1 would move away from Yax and sit on the bed or the couch.

When Doe 1 was 15 years old, Yax started giving her alcohol and marijuana to drink before sexual encounters and "if [she] did things with him." Yax would sometimes threaten to stop giving her alcohol, and she did not want him to stop. Doe 1 would agree to sexual encounters with him if he gave her alcohol. The alcohol and drugs made her feel "good" and made "the pain go away," because she "wouldn't feel anything" or "care about anything."

In October 2021, Doe 1 saw a text message from Yax on Doe 2's cell phone. Yax texted that he was mad at Doe 2 for going to the park and that she needed to go back to

7

the bedroom because "it was just going to be for a little bit and 'cause he said something about he didn't get to cum." The message was similar to messages that Yax had sent to Doe 1. When Yax and Doe 1 were interrupted by Doe 1's mother heading to the bedroom, Yax would later text Doe 1 to come back to the room so that he could "finish," meaning ejaculate. Doe 1 understood from the text message that Yax was also sexually abusing Doe 2. Doe 1 had suspected that Yax was sexually abusing Doe 2 because Doe 2 seemed angry all the time, blocked the girls' bedroom door with furniture, and sometimes was in Yax's bedroom alone with him and with the door locked.

B.    *Doe 2*

Doe 2 testified that Yax first touched her inappropriately when she was 10 or 11 years old. Doe 2 feared Yax because he is bigger than she is. During the first encounter, Yax instructed Doe 2 to touch his penis with her hand, which she did. He later inserted his penis into her vagina sometime before she and Doe 1 had their own bedroom. Doe 2 told Yax to stop, "but he wouldn't." Yax told Doe 2 not to tell her mother about the abuse.

Asked how often Yax sexually assaulted her by inserting his penis into her vagina, Doe 2 responded that "it was mostly weekdays" and "[s]ometimes it would happen multiple times in a week, and, sometimes, like, it wouldn't happen as much." Yax sexually abused Doe 2 in the master bedroom when both Doe 1 and their mother were working.

8

Yax last sexually abused Doe 2 in mid-September 2021. On that occasion, Yax would not allow Doe 2 to leave the house to visit a friend "until he would rape [her]." More than once, Yax went into Doe 2's bedroom and "dragged [her] to the room, and after that, when [she] tried to get out, he would stand in front of the door and tell [her] that it was just going to be quick." When Yax dragged her, Doe 2 held onto the walls because she did not want to go into Yax's bedroom. Yax overpowered her. Doe 2 explained that "dragging" means "like I was hanging onto the walls. And he was, like, trying to get me to go with him." On cross-examination, Yax's counsel asked Doe 2 if she had previously told law enforcement that in the mid-September incident Yax carried her, and she explained: "Yeah. He threw me over his shoulder sometimes. But I would, like, hang onto the walls. And he would grab my legs and be pulling me."

Doe 2 called 911 on October 1, 2021, the day that Doe 1 saw the text message that Yax sent to Doe 2. The prosecution played a recording of the call for the jury. Doe 2 told the dispatcher that she needed the police because "[m]y stepdad has been raping me," which Doe 2 told the operator had last occurred the previous Saturday. The 911 dispatcher asked Doe 2 if Yax hurt her or threatened her when he was sexually assaulting her, and she responded, "Yeah. He, yeah." Doe 2 explained that she had confronted Yax about the abuse, and the family was fighting. Others testified that Doe 1 hit Yax with a baseball bat on the head and on his back.

9

IV.    *Law enforcement investigation*

Law enforcement responded to the 911 call. Yax was arrested and taken to the hospital, accompanied by a law enforcement officer.[1] Yax was transported to the sheriff's station after he was released from the hospital.

On October 2, 2021, Yax was interviewed at the sheriff's station by a detective. The detective read Yax his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), which the detective said that Yax understood. After being read those rights, Yax agreed to speak with the detective about the allegations. Yax adamantly denied that he had any sexual relations with either Doe 1 or Doe 2 and "basically called them liars."

Swabs were collected from Yax's penis and scrotum at the sheriff's station on the same day that he was interviewed. Doe 1's DNA was found to be a likely contributor to the sample collected from Yax's penis and scrotum. Doe 1 testified that Yax had last sexually abused her two nights before he was arrested.

Law enforcement searched Yax's cell phone and located 10 sexually explicit video recordings on Yax's phone that were recorded around 2021. The sexual acts depicted in the recordings were described by law enforcement as: "Sexual intercourse, so penis to vagina; digital penetration, so fingers into vagina; um, touching of the private parts." The recordings were of a Hispanic male with two different Hispanic females. The faces of the females were covered with a pillow or blanket, and the man's face was also obscured.

---

[1]    It is not clear from the record whether law enforcement arrested Yax before or after he was taken to the hospital. But Yax testified that he was arrested on the same day that Doe 1 struck him with the baseball bat.

10

Law enforcement took still photographic images from the recordings. At trial, Aguilar identified Yax, Doe 1, and Doe 2 in those images.

On the day that Doe 2 called 911, Lisbeth Vera worked for Riverside County's child protective services (CPS) as a social services practitioner and an investigating worker. Vera received an immediate response referral that night and spoke with both Doe 1 and Doe 2. At trial, Vera explained that CPS conducts its investigation independently of law enforcement. The purpose of CPS's investigation is to ascertain the children's welfare and to ensure their safety.

As part of the CPS investigation, Vera spoke with Yax when he was in jail. She could not recall the exact date that she spoke with him. Vera is fluent in Spanish and spoke with Yax in Spanish. Vera asked Yax if he agreed to speak with her, and he said that he did. Vera asked Yax how he disciplined the girls, and he responded "along the lines of 'Yo Viole,'" which Vera explained means, "'I raped.'" Vera did not believe that Yax understood the word "'discipline,'" so she followed up by asking him why he was in jail, to which he again said, "'Yo viole,'" as to one of his stepdaughters specifically (Vera did not say which), and "'I'm not a criminal, but now I am.'" Vera told the investigating law enforcement officer about the statements that Yax made.

V.  *Yax's testimony*

Yax testified on his own behalf. Yax admitted that he had sex with both Doe 1 and Doe 2, but he denied that he had any sexual contact with them before they were 15 years old. But Yax also said that "everything began" with Doe 1 in 2016, which is when

11

she was 11 or 12 years old. Yax claimed that his sexual encounters with Doe 1 and Doe 2 were consensual, and he denied that he ever used any kind of force or threatened them in any way.

VI.    *The verdict and sentencing*

The jury convicted Yax of 30 counts and found true all 18 of the multiple-victim one strike allegations. The prosecution dismissed the 31st count (one of the aggravated sexual assault by oral copulation offenses involving Doe 2). The trial court sentenced Yax to an aggregate term of 615 years to life in state prison. The trial court awarded 602 days of local custody credit and indicated that he was not entitled to any credit under section 2933.

DISCUSSION

I.    *Yax's postarrest statements*

Yax contends that the statements that he gave to the CPS social worker while he was in jail violated his Fifth Amendment right against self-incrimination, because (1) he had already invoked his right to counsel, and (2) he contends that Vera's "position as an investigator for Child Protective Services" rendered her "a 'peace officer'" under subdivision (h) of section 830.3 (§ 830.3(h)). Yax argues in the alternative that Vera was acting as an agent of law enforcement for purposes of the Fifth Amendment. The argument is forfeited but also fails on the merits.

A.     *Relevant proceedings*

Yax moved in limine to exclude the statements that he made to the CPS social worker while he was in jail, arguing that they were irrelevant and lacked foundation. At a pretrial hearing, defense counsel reiterated that she moved to exclude the statements "on relevance grounds" because they were not "specific enough to know that he's talking about the charges in this case." During that hearing, counsel also argued that Yax's statements should be excluded on the grounds of vagueness, relevance, and hearsay, along with "the fact that he already invoked his Miranda rights and then she's speaking to him afterwards, I would ask that his statement be excluded." The trial court questioned, "She's not a law enforcement agent; right?" The prosecutor responded, "Correct, Your Honor. She was doing an independent interview of Mr. Garcia as part of her role for [the Department of Public Social Services], and she is not an agent of law enforcement. So no Miranda was required. It would not apply to her." Yax's counsel did not respond to the prosecution's remark about *Miranda* and instead additionally objected to the testimony on the ground that it lacked foundation, arguing that it was not clear whether Vera was fluent in Spanish. The court set an Evidence Code section 402 hearing to determine Vera's fluency in the language.

At the later hearing, Vera explained that she has spoken Spanish her entire life and is fluent in the language. In addition, she explained that she is a social services practitioner who works for Riverside County and that she spoke to Yax in her capacity as a social worker on behalf of Riverside County's CPS or "Department of Social Services"

13

(she used both terms). Vera explained that CPS is not affiliated with law enforcement or the sheriff's department, but they "work conjointly." Vera could not recall if she spoke with Yax on the same day that she spoke with Doe 1 and Doe 2, which was the day that CPS received the referral, or one or two days later. When Vera interviewed Yax in his jail cell or pod, she was not accompanied by a law enforcement officer.

Yax's counsel again objected to Vera's testimony as follows: "Well, I would object to this testimony. It wasn't recorded. It's not in writing. It was related a few days after the fact. It's an out-of-court statement offered for the truth. It's unreliable hearsay and lacks foundation. Therefore, I don't believe it's relevant, and I object under [Evidence Code section] 352, Fifth and Sixth and Fourteenth Amendments, and the state and federal Constitutions." The prosecutor argued that Yax made the admission to a CPS case worker, who is "not an agent of law enforcement" or "there on behalf of law enforcement." The court inquired further of Vera about the statements that Yax made. The court also asked the court interpreter about the meaning of "violar," and the interpreter explained that depending on context the word could mean "to violate or break the law," "to rape," or "to desecrate." After the court's inquiry, Yax's counsel expressed concern that Vera misunderstood what Yax said, and counsel again objected to Vera's testimony on the grounds of "foundation, relevance, Fifth, Sixth Amendment, due process, and both the state and federal Constitutions—I think this is an inaccurate statement and it's highly prejudicial." The court ruled: "I think the definition of to violate the law does not fit in the sentence. He wouldn't say he violated the law with the

14

older of the two sisters, but rape does fit.  So I'm going to allow it, and, I guess, we'll bring the jury in."

B.  *Legal framework*

The Fifth Amendment provides:  "No person . . . shall be compelled in any criminal case to be a witness against himself."  (U.S. Const., 5th Amend.)  *Miranda* "and its progeny protect the privilege against self-incrimination by precluding suspects from being subjected to custodial interrogation unless and until they have knowingly and voluntarily waived their rights to remain silent, to have an attorney present, and, if indigent, to have counsel appointed."  (*People v. Gamache* (2010) 48 Cal.4th 347, 384 (*Gamache*); *Miranda*, *supra*, 384 U.S. at pp. 478-479.)  A statement obtained in violation of a suspect's *Miranda* rights may not be introduced by the prosecution in its case-in-chief.  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 55; *People v. Keo* (2019) 40 Cal.App.5th 169, 180 (*Keo*).)

"Once the right to counsel has been invoked, further questioning is forbidden until counsel has been provided, 'unless the suspect personally "initiates further communication, exchanges, or conversations" with the authorities.'"  (*Gamache*, *supra*, 48 Cal.4th at p. 384; *Edwards v. Arizona* (1981) 451 U.S. 477, 484-485.)  If """reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation.""""  (*Gamache*, at p. 385.)

*Miranda*'s requirements apply "to 'law enforcement officials,' their agents, and agents of the court, while the suspect is in official custody." (*In re Deborah C.* (1981) 30 Cal.3d 125, 130 (*Deborah C.*); *People v. Whitt* (1984) 36 Cal.3d 724, 745.) "'"A private citizen is not required to advise another individual of his rights before questioning him. Absent evidence of complicity on the part of law enforcement officials, the admissions or statements of a defendant to a private citizen infringe no constitutional guarantees."'" (*Whitt*, at p. 745.)

In reviewing the denial of a suppression motion on *Miranda* grounds, "'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.'" (*Gamache*, *supra*, 48 Cal.4th at p. 385.)

C.      *Analysis*

Yax never expressly challenged the admissibility of the statements that he made to Vera in jail on the ground that she was a law enforcement officer under section 830.3(h) or that she was acting on behalf of law enforcement for purposes of *Miranda* when she spoke with Yax. The theories consequently were "not litigated and no opportunity was presented to the trial court to resolve any material factual disputes and make necessary factual findings." (*People v. Linton* (2013) 56 Cal.4th 1146, 1166.) The arguments are therefore forfeited. (*Ibid.*; *People v. Cruz* (2008) 44 Cal.4th 636, 669.)

16

We nevertheless address the merits of the arguments to preclude a collateral ineffective assistance of counsel claim. (*People v. Crittenden* (1994) 9 Cal.4th 83, 146 [an appellate court may exercise its discretion to consider the merits of a claim to avoid future arguments concerning ineffective assistance of counsel].) We conclude that *Miranda* did not apply, because Vera was not a law enforcement officer or an agent acting on their behalf when she spoke to Yax.[2]

First, we reject Yax's argument that Vera is a "peace officer" within the meaning section 830.3(h) and therefore is a law enforcement officer subject to the requirements of *Miranda*. Section 830.3(h) provides that "[a]ll investigators of *the State Departments* of Health Care Services, Public Health, and Social Services" (*ibid.*, italics added) "are peace officers whose authority extends to any place in the state for the purpose of performing their primary duty" (§ 830.3). As explained by another court rejecting the same argument raised by Yax, "this definition of peace officers only includes investigators for the State Department of Social Services, not dependency investigators employed by a local agency

---

[2] Yax argues that the statements he made to Vera violated his Fifth Amendment right to counsel because he spoke with her after he invoked his right to counsel, but, as the People point out, the record contains no evidence that Yax invoked his right to counsel, let alone that he did so before speaking with Vera. The law enforcement officer who interviewed Yax at the sheriff's station the day after the 911 call testified that he advised Yax of his *Miranda* rights before he interviewed Yax about the allegations and that Yax waived those rights. The law enforcement officer did not testify about Yax subsequently invoking his right to counsel. Assuming for the sake of argument that Yax did subsequently invoke his right to counsel, it is not clear when Vera interviewed Yax in relation to that invocation. Nevertheless, the relevant inquiry is the same regardless of whether Vera spoke with Yax before he received any *Miranda* warning or after he invoked his right to counsel—*Miranda* does not apply unless Vera was a law enforcement officer or an agent acting on their behalf. (*Deborah C.*, *supra*, 30 Cal.3d at p. 130.)

17

such as [Riverside County CPS]." (*Keo*, *supra*, 40 Cal.App.5th at p. 181.) Vera was employed by Riverside County, not the State of California. Vera thus was employed by a local agency and was not a peace officer within the meaning of section 830.3(h).

Second, we reject Yax's argument that Vera was acting as a law enforcement agent when she spoke with Yax. *Keo* rejected a similar argument. (*Keo*, *supra*, 40 Cal.App.5th at pp. 181, 183-184.) *Keo* reasoned that the social worker's "function as a dependency investigator was to determine the best interests of [the children], and whether they should be returned to [the defendant's] custody after his release. 'Unlike criminal trials, the primary purpose of dependency hearings is to protect the child, not prosecute the parents.'" (*Id.* at pp. 182-183.) Consistent with the reasoning in *Keo*, Vera explained that the investigation that she was conducting on behalf of CPS was for the purpose of ensuring the safety of Doe 1 and Doe 2. In this vein, the initial inquiry she made that elicited the response, "'I raped,'" concerned Yax's method of disciplining the girls. Moreover, Vera explained that CPS's investigation was independent of the criminal investigation and that she was not asked to speak to Yax on behalf of law enforcement. The record therefore shows that Vera was not acting as a law enforcement agent when she spoke with Yax, and there is no contrary evidence.

Yax's argument to the contrary is unavailing. He contends that Vera was working on behalf of law enforcement because she told the court at the Evidence Code section 402 hearing that law enforcement and CPS "work conjointly." She otherwise stated in the same response that CPS and law enforcement were not in any way affiliated, and she

18

testified that her investigation was conducted independently of law enforcement's investigation. There is no evidence that law enforcement asked Vera to question Yax or that she was otherwise questioning him on their behalf. On the contrary, Vera explained that the purpose of her independent CPS investigation was to gather information for the purpose of ensuring the children's safety.

Given that (1) as a county social worker Vera is not a law enforcement officer under section 830.3(h) and (2) there is no evidence that Vera was acting as a law enforcement agent when she spoke with Yax in her capacity as a CPS social worker, *Miranda* did not apply when Vera spoke with Yax. His statements to her therefore did not violate his right to self-incrimination.

II. *Sufficiency of the evidence*

Yax contends that there is insufficient evidence that he used duress in committing the following 11 offenses against Doe 1 when she was between the ages of 11 and 17: (1) two counts of oral copulation of a child under 14 years old (§ 269, subd. (a)(4); counts 14 & 19); (2) two counts of sodomy of a child under 14 years old (§ 269, subd. (a)(3); counts 15 & 18); (3) three counts of lewd and lascivious conduct on a child under 14 years old (§ 288, subd. (b)(1); counts 16, 20, & 22); and (4) four counts of rape of a minor 14 years old or older (§ 264, subd. (c)(2); counts 23-26). In addition, Yax contends that there is insufficient evidence that he kidnapped Doe 2 for the purpose of committing rape (§ 209, subd. (b)(1); count 29). We are not persuaded.

A.      *Standard of review*

"In reviewing a sufficiency of the evidence claim, our role is limited.  We review the entire record to determine whether it discloses reasonable and credible evidence to allow a rational trier of fact to determine guilt beyond a reasonable doubt."  (*People v. Cardenas* (2020) 53 Cal.App.5th 102, 119, fn. 11.)  "We draw all reasonable inferences in favor of the judgment."  (*Ibid.*)  "Matters of credibility of witnesses and the weight of the evidence are ""'the exclusive province'"" of the trier of fact."  (*Ibid.*)

B.      *By means of force or duress*

Subdivision (b)(1) of section 288 prohibits the commission of a lewd or lascivious act on a child under age 14, with the intent to arouse or satisfy the sexual desires of the perpetrator or the child, "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person."  The oral copulation and sodomy charges contain the same force, violence, duress, menace, or fear element. (§§ 269, subd. (a)(3)-(4), 286, subd. (c)(2)(B), 287, subd. (c)(2)(B).)  So does the charge of forcible rape of a minor 14 years or older.  (§§ 264, subd. (c)(2), 261, subd. (a)(2).) Forcible rape requires proof that the defendant engaged in "an act of sexual intercourse" with the alleged victim without the victim's consent.  (§ 261, subd. (a)(2); *People v. Torres* (2024) 107 Cal.App.5th 513, 530 (*Torres*).)

The term "'[d]uress'" is statutorily defined in the forcible rape statute as meaning "a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would

20

not have been performed, or acquiesce in an act to which one otherwise would not have submitted." (§ 261, subd. (b)(1); *Torres*, *supra*, 107 Cal.App.5th at p. 531.) Duress is not statutorily defined for the other offenses (§§ 269, subd. (a)(3)-(4), 286, subd. (c)(2)(B), 287, subd. (c)(2)(B), 288, subd. (b)(1)), but as used in those statutes the term has the same meaning as in the forcible rape statute (*People v. Soto* (2011) 51 Cal.4th 229, 246 (*Soto*) [§ 288, subd. (b)(1)]; *People v. Barton* (2020) 56 Cal.App.5th 496, 517-518 [aggravated sodomy and oral copulation]).

Whether defendant used "duress is measured by a purely objective standard," so a jury can find that a defendant used threats or intimidation to commit the offense "without resolving how the victim subjectively perceived or responded to this behavior." (*Soto*, *supra*, 51 Cal.4th at p. 246.) The focus is "on the defendant's wrongful act, not the victim's response to it." (*Ibid.*) It is irrelevant "how the victim subjectively perceived or responded to [the] behavior." (*Ibid.*)

"The very nature of duress is psychological coercion." (*People v. Cochran* (2002) 103 Cal.App.4th 8, 15, overruled on another ground in *Soto*, *supra*, 55 Cal.4th at p. 248, fn. 12; *People v. Schulz* (1992) 2 Cal.App.4th 999, 1005.) In determining whether an offense was accomplished by duress, the trier of fact must consider the totality of the circumstances, "including the age of the victim, and the victim's relationship to the defendant." (§ 261, subd. (b)(1); *People v. Martinez* (2024) 105 Cal.App.5th 178, 189; *Schulz*, at p. 1005.) Other relevant factors "include threats to harm the victim, physically controlling the victim when the victim attempts to resist, and warnings to the victim that

21

revealing the molestation would result in jeopardizing the family." (*Cochran*, at pp. 14-16.) "The fact that the victim testifies the defendant did not use force or threats does not require a finding of no duress; the victim's testimony must be considered in light of [their] age and [their] relationship to the defendant." (*Id.* at p. 15; *Torres*, *supra*, 107 Cal.App.5th at p. 532.) "A simple warning to a child not to report a molestation reasonably implies the child should not otherwise protest or resist the sexual imposition." (*People v. Senior* (1992) 3 Cal.App.4th 765, 775.)

The record contains substantial evidence that Yax used duress to commit the 11 specified sexual offenses against Doe 1 when she was between 11 and 17 years old. Yax became a part of Doe 1's family when she was very young, and she considered him to be her father. By the time that Doe 1 was age 11, Yax had already been sexually abusing her for five years, and it seemed to her as though he had always been sexually abusing her. Yax was bigger and stronger than Doe 1 when she testified at age 18, from which the jury could reasonably infer that there was an even greater disparity when she was younger. Moreover, as a parental figure, he exerted dominance and control over Doe 1 to the point that she believed that she had no choice but to acquiesce, because she was not allowed to tell him, "No." Yax also physically overpowered her when she resisted, pulling her legs down and pinning her down with his larger body. In addition, although Doe 1 could not recall the exact wording of the admonition, Yax told her not to tell her mother about the abuse. Considering the totality of circumstances, we conclude that

22

substantial evidence supports a finding that Yax used duress in committing counts 14, 15, 16, 18, 19, 20, and 22 through 26 against Doe 1.

Yax's argument to the contrary is unavailing. He contends that there is insufficient evidence of duress because Doe 1 said that she never feared him and because she willingly accepted "items she wanted from [Yax] as a reward." First, "'[t]he fact that the victim testifies the defendant did not use force or threats does not preclude a finding of duress.'" (*Torres*, *supra*, 107 Cal.App.5th at p. 532.) Likewise, a victim's testimony that they did not fear the perpetrator also does not preclude a finding of duress. (See *Soto*, *supra*, 51 Cal.4th at p. 243 ["A perpetrator may *use* duress, menace, or threats against a victim even if this conduct does not ultimately influence the victim's state of mind"].) Second, Doe 1's acceptance of rewards such as marijuana and alcohol when she was older does not nullify the evidence that Yax committed the challenged offenses against her with duress and through extreme psychological coercion. As we recently explained, "a 16 or 17 year old is still a minor and still vulnerable to manipulation and coercion by adults and parental figures." (*Torres*, at p. 537.) That is true here—Yax started sexually abusing Doe 1 when she was young, she received no relief when she reported the abuse, she believed that her situation was completely hopeless, and marijuana and alcohol helped her cope with the abuse that she did not feel empowered to stop.

23

C.    *Kidnapping*

Yax contends that there is insufficient evidence to support the one count of kidnapping Doe 2 to commit rape (count 29) in violation of section 209, subdivision (b). The contention lacks merit.

A person is guilty of aggravated kidnapping under section 209, subdivision (b), if the person "kidnaps or carries away an individual to commit . . . rape." (§ 209, subd. (b)(1).)  Kidnapping for rape requires movement of the victim that is not merely incidental to the commission of the rape and that increases the risk of harm to the victim over and above that necessarily present in the crime of rape itself.  (§ 209, subd. (b)(2); *People v. Martinez* (1999) 20 Cal.4th 225, 232, overruled on another ground in *People v. Fontenot* (2019) 8 Cal.5th 57, 70.)  "These two aspects are not mutually exclusive, but interrelated."  (*People v. Rayford* (1994) 9 Cal.4th 1, 12.)

With respect to the first factor, "the jury considers the 'scope and nature' of the movement, which includes the actual distance a victim is moved.  [Citations.]  There is, however, no minimum distance a defendant must move a victim to satisfy the first" factor.  (*People v. Vines* (2011) 51 Cal.4th 830, 870 (*Vines*), overruled on another ground by *People v. Hardy* (2018) 5 Cal.5th 56, 104.)

As to the second factor, "the increased risk may be of either physical or psychological harm."  (*People v. Robertson* (2012) 208 Cal.App.4th 965, 984 (*Robertson*).)  For this factor, the jury may consider "whether the movement gave the defendant 'the decreased likelihood of detection' and an 'enhanced opportunity to

24

commit additional crimes.'"  (*People v. Shadden* (2001) 93 Cal.App.4th 164, 168

(*Shadden*); *Robertson*, at p. 983.)

Yax challenges the sufficiency of the evidence supporting both factors.  As to the

asportation factor, he contends that the evidence shows that "the apartment was quite

small, and the distance [Yax] moved [Doe 2] was short and necessarily not substantial as

required."  The contention fails.  First, there is no minimum distance necessary to satisfy

the asportation requirement.  (*Vines*, *supra*, 51 Cal.4th at p. 870; *Robertson*, *supra*, 208

Cal.App.4th at pp. 984, 986; *People v. Dominguez* (2006) 39 Cal.4th 1141, 1152.)

Second, substantial evidence shows that the movement was not merely incidental to the

rape.  (§ 209, subd. (b)(2).)  Yax physically removed Doe 2 from her bedroom and

dragged and carried her into the nearby master bedroom across the hall, where he blocked

the doorway and prevented her from leaving.  "[A] rape involves solely an attack on the

person and does not necessarily require movement to complete the crime."  (*People v.

Salazar* (1995) 33 Cal.App.4th 341, 347, fn. 8.)  Accordingly, when "'a defendant drags a

victim to another place, and then attempts a rape, the jury may reasonably infer that the

movement was neither part of nor necessary to the rape.'"  (*Robertson*, at p. 984.)  The

jury could reasonably infer that moving Doe 2 into the master bedroom was not

incidental to the rape, because Yax "only began the sexual attack after he moved her."

(*Shadden*, *supra*, 93 Cal.App.4th at p. 169.)  For all of these reasons, the evidence was

more than sufficient to support a finding beyond a reasonable doubt that Yax's movement

25

of Doe 2 from her bedroom into the master bedroom was not merely incidental to the rape.

There also is substantial evidence that Yax's movement of Doe 2 increased the risk of harm to her beyond the rape itself. "'[A] rape victim is certainly more at risk when concealed from public view and therefore more vulnerable to attack.'" (*Robertson*, *supra*, 208 Cal.App.4th at p. 985.) Moving Doe 2 into the master bedroom significantly decreased the likelihood of detection. The girls' bedroom did not even have a doorknob, but the master bedroom door had not only a doorknob but also a lock. Moreover, when he was inside the master bedroom, Yax watched the livestream of the security cameras he had placed all over the residence on a television screen, which would help him avoid detection during the assault by alerting him if either Aguilar or Doe 1 returned home from work. By moving Doe 2 into a locked bedroom in which he could watch the security camera feed, Yax increased the risk of harm to Doe 1 by allowing him to rape her in a secluded and secure place, which "made it less likely for others to discover the crime and decreased the odds of detection." (*Shadden*, *supra*, 93 Cal.App.4th at p. 170.)

For these reasons, we conclude that substantial evidence supports the jury's findings that Yax's forcible movement of Doe 2 from her bedroom into the master bedroom was not merely incidental to the rape and increased the harm to Doe 2.

III.    *Presentence conduct credits*

Yax contends that the trial court prejudicially erred by not awarding him presentence conduct credits. The People counter that Yax is not entitled to any conduct

credit under the one strike law, section 667.61.  *People v. Adams* (2018) 28 Cal.App.5th 170 (*Adams*) held that presentence conduct credit is not available for one strike offenders. We find the analysis in *Adams* persuasive.

The *Adams* court reasoned:  "Section 667.61 was amended in 2006—prior to the present crimes—to eliminate the existing section 667.61, subdivision (j) and any reference to presentence conduct credits.  [Citation.] . . . Committee reports evidence the Legislature's intent to eliminate conduct credit for defendants sentenced under section 667.61, the so-called 'One-Strike Law.'  The Senate Committee on Public Safety's analysis of Senate Bill No. 1128 (2005-2006 Reg. Sess.) unambiguously states: 'Elimination of Sentencing Credits for One-Strike Inmates  [¶]  Existing law provides that a defendant sentenced to a term of imprisonment of either 15 years to life or 25 years to life under the provisions of the "one-strike" sentencing scheme shall not have his or her sentence reduced by more than 15% by good-time/work-time credits.  (Penal Code 667.61, subd. (j).)  [¶]  This bill eliminates conduct/work credits for inmates sentenced under the one-strike law.'  (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 1128 (2005-2006 Reg. Sess.) as amended Mar. 7, 2006, p. N, underscoring omitted; accord, *id.* at p. W ['This bill eliminates sentencing credits that under existing law can reduce a defendant's minimum term by up to 15%' (underscoring omitted)]; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1128 (2005-2006 Reg. Sess.) as amended May 26, 2006, pp. 8-9 [Sen. Bill No. 1128 eliminates eligibility 'for credit to reduce the minimum term imposed']; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d

reading analysis of Sen. Bill No. 1128 (2005-2006 Reg. Sess.) as amended May 30, 2006, p. 9 [same].)  In Couzens and Bigelow, Sex Crimes:  California Law and Procedure (The Rutter Group 2015) paragraph 13:15, page 13-78, the authors conclude:  'Section[ ] . . . 667.61 (One Strike law) . . . [was] amended in 2006 to eliminate the provision that allowed such crimes to accrue 15% conduct credits, whether before or after sentencing[.]  Now there are no conduct credits allowed against the minimum term.'  We hold, therefore, that defendants given indeterminate terms under section 667.61 are not entitled to any presentence conduct credit." (*Adams*, *supra*, 28 Cal.App.5th at p. 182; see also *People v. Dearborne* (2019) 34 Cal.App.5th 250, 267-268 [concurring with *Adams*]; *People v. Govan* (2023) 91 Cal.App.5th 1015, 1036-1037 [same].)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
                                                                                         J.

We concur:

RAMIREZ
                  P. J.

CODRINGTON
                  J.